Robert DOWNS, Plaintiff–Appellant,

v.

LOS ANGELES UNIFIED SCHOOL DISTRICT, Defendant–Appellee.

No. 99–56797.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 6, 2000

Filed Sept. 7, 2000

Frederick H. Nelson, American Liberties Institute, Orlando, Florida, for the plaintiff-appellant.

Mary Kay Jackson, Office of the General Counsel, Los Angeles Unified School District, Los Angeles, California, for the defendant-appellee.

Before: TROTT, FERNANDEZ, and McKEOWN, Circuit Judges.

TROTT, Circuit Judge:

The narrow question we must answer is whether the First Amendment compels a public high school to share the podium with a teacher with antagonistic and contrary views when the school speaks to its own constituents on the subject of how students should behave towards each other while in school. The answer to this question clearly is no.

Appellant Robert Downs is a teacher at Doris S. Leichman High School ("Leichman High"), a school within appellee Los Angeles Unified School District ("LAUSD"). Downs filed suit against LAUSD pursuant to 42 U.S.C. § 1983 and the United States and California Constitutions, seeking a permanent injunction, de-claratory judgment, compensatory damages and attorneys' fees. In his lawsuit, Downs alleged that LAUSD, through its officers and employees, violated his constitutional right to freedom of speech by removing, and by asking Downs to remove, competing material that Downs had posted in the school in response to materials posted on bulletin boards set up by Leichman High staff members for the purpose of recognizing Gay and Lesbian Awareness Month.

The district court granted summary judgment in favor of LAUSD. On appeal, Downs argues that the district court improperly defined and characterized the forum to which he sought access, and thereby employed an incorrect legal standard in deciding the motion for summary judgment. We have jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM the grant of summary judgment in LAUSD's favor, but on grounds slightly different from those relied on by the district court. *See Baker v. Liberty Mut. Ins. Co.*, 143 F.3d 1260, 1263 (9th Cir.1998) ("This court may affirm the summary judgment dismissal on any basis supported by the record.").

## Factual Background

The facts of the case, presented in the light most favorable to Downs, *see Berry v. Valence Tech., Inc.*, 175 F.3d 699, 703 (9th Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 528, 145 L.Ed.2d 409 (1999), reveal that on April 11, 1997, LAUSD issued "Memorandum No. 111," titled "Gay and Lesbian Awareness Month," to all schools and offices in the school district. Memorandum No. 111 referred to a May 18, 1992, formal Board of Education resolution designating June of each year as "a time to focus on gay and lesbian issues." The Memorandum noted that the Board of Education's resolution was passed to support "Educating for Diversity." The Memorandum also specified that

the District's multicultural and human relations education policy includes the expectations that: "Each student has

equal access to a quality education and an opportunity to participate fully in the academic and social activities of the school," and "School policies and practices act to foster a climate that reduces fears related to difference and deters name-calling and acts of violence or threats motivated by hate and bigotry." The Memorandum informed the schools and offices that the "Office of Intergroup Relations and the Multicultural Unit, Division of Instructional Services, and the Gay and Lesbian Education Commission" would provide posters and materials in support of Gay and Lesbian Awareness Month.

The posters and materials to be provided to the schools were designed to aid in "the elimination of hate and the creation of a safe school environment for all students." "In recognition that some of the materials can be controversial in nature," the Memorandum provided that "the representations on the posters" were reviewed by, among other groups, the "Parent Community Services Branch." The Memorandum also "recognize[d] that schools are part of a community and must respect the sentiments held by the local community."

Pursuant to Memorandum No. 111 and the policies described therein, at some time in late May or early June 1997, some Leichman High staff members created a bulletin board inside the school building on which faculty and staff could post materials related to Gay and Lesbian Awareness Month in addition to the materials provided by the district office. Staff members created a similar board the following year. Materials did not need approval before posting on the Gay and Lesbian Awareness bulletin boards, but were subject to the oversight of the school principal, who had ultimate authority within the school over the content of the boards. This was the actual practice and policy at Leichman High. During the time period at issue in this case, there were two different principals at Leichman High: Donna Olmsted from January 1993 to June 1997, and Joseph Marino from July 1997 through at least the beginning of this litigation. As school principals, Olmsted and Marino were accountable to the school board, which itself is made up of publicly elected officials.

Materials posted by faculty and staff that Olmsted and Marino allowed to remain on the school's Gay and Lesbian Awareness bulletin boards covered a wide range of topics. They included a poster titled "The Civil Rights Movement;" a poster titled "Diversity is Beautiful;" a poster on Name Calling; a poster titled "What is a Family;" a bar/pie chart reflecting Statistics on Hate Crimes; a sheet of paper on "The Rainbow Flag;" a sheet of paper explaining the gay and lesbian symbols; a laminated felt rainbow flag with the Greek letter Lambda; a newspaper article regarding LAUSD Board approval of domestic partner benefits; a Board resolution regarding discrimination; a Los Angeles County Human Relations Commission brochure regarding anti-gay and lesbian bashing; a statement that June is Gay and Lesbian Awareness/Pride month; a sheet of paper identifying famous gays and lesbians in history; a sheet of paper discussing the history of the pink triangle symbol; and a sheet of paper discussing the Lamda symbol. There is no evidence in the record that individuals other than faculty and staff at Leichman High posted these or any other materials on the school's Gay and Lesbian Awareness bulletin boards.

■ Downs objected to the recognition of Gay and Lesbian Awareness Month at Leichman High. In June of 1997, Downs created his own bulletin board across the hall from his classroom titled "Testing Tolerance." In June of 1998, in response to postings on other Gay and Lesbian Awareness bulletin boards within the school, Downs created a competing bulletin board titled "Redefining the Family." Included among the materials posted by Downs were a portion of the Declaration of Independence, newspaper articles, various school district memoranda, and the following four separate excerpts:

According to lesbian activist Tories Osborn, 60% of Americans hold the belief that homosexuality is immoral. Most mainline religions in America ... condemn homosexual behavior.

Do not lie with a man as one lies with a woman; that is detestable. Do not have sexual relations with an animal and defile yourself with it. A woman must not present herself to an animal to have sexual relations with it; that is a perversion. Do not defile yourselves in any of these ways because this is how the nations that I am going to drive out before you become defiled. Leviticus 18:22–24.

Obviously and without contention the simultaneous stimulation and mutual satisfaction which the complementary anatomical structures and functioning of the procreative organs of the man and woman produce indicate that they are purposefully intended for one another. Procreation and thereby the proliferation of the human species are further confirmation that such unions are appropriate and natural. Beyond this, the various organs of the digestive and excretory systems can and have been used for similar gratification, but obviously these acts are different and can be objectively evaluated as such.

Anti-sodomy laws in many states stand to prevent or at least complicate homosexual marriage and adoption ... because ... the United States Supreme Court upheld state authority to maintain laws prohibiting homosexual sodomy.

From the paltry record before us, we cannot discern when which particular materials were posted or taken down.[1] However, as will become clear from the body of our opinion, such details ultimately prove to be irrelevant.

In both 1997 and 1998, after other faculty members complained, Olmsted and Marino either removed Downs's materials or ordered Downs to remove them himself. The record clearly demonstrates that Downs's materials were ordered to be removed in part because members of the school community deemed them "disrespectful," "offensive," "upsetting," "objectionable," and "derogatory." Marino testified that he considered Downs's material inconsistent with the purposes of the Gay and Lesbian Awareness month because he "did not see [Downs's] activity supporting tolerance [and] did not see [Downs's] material supporting diversity."

Leading up to the 1997 removal of Downs's materials, Olmsted, Downs, and LAUSD's counsel engaged in both a written and verbal dispute over the bulletin board issue. In a June 9, 1997 letter to Downs, Olmsted informed him that "[a]s long as you are employed by LA Unified and this Board policy [against discrimination on the grounds of sexual orientation] remains, this is the policy that you are expected to follow. If you worked for a private school, then this would not be the case." In the June 9 letter, Olmsted also reminded Downs of their earlier discussion in which she had told Downs that he could create a bulletin board with the understanding that he had "the right of free speech as an individual, providing you are not being discriminatory and providing you maintain the separation of church and state in your statements. This is one of our obligations as District employees."

---

1. The parties' excerpts of record and the district court record provide remarkably little information regarding what exactly was posted on the bulletin boards at Leichman High. In creating the excerpts of record for appeal, it behooves parties to treat appellate panels not as if we were pigs sniffing for truffles, see *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991), but instead to fill our troughs to the brim with the relevant, let alone necessary, information. Were we deciding this case under the traditional rubric of "view-point neutrality," we would have little to base a reasoned decision upon. Our decision makes the substance of the posted materials largely irrelevant, but the parties had no reason to assume that this would be the case, considering that much of the argument in the district court and in the parties' appellate briefs focused upon viewpoint neutrality. We offer some discussion of the substance of the postings merely to contextualize the dispute involved in this case.

In another letter written one week later, Olmsted informed Downs that she had removed "recently added items" from the bulletin board across from Downs's classroom because the items "have nothing to do with school work, student work or District approved information." Olmsted continued on to "advise" Downs that he should remove the remaining items on the board because "for the most part [they] have no connection to material that is District approved, school work or student work." The following month, LAUSD's legal counsel, Jesus Estrada–Melendez, wrote Downs to confirm an earlier conversation in which he had informed Downs that the bulletin boards were not "free speech zones," and that "[f]or this reason Ms. Olmsted as the principal of the school is the proper official to make certain that these boards are used appropriately."

New school Principal Marino followed this pattern of communication in 1998 with a Memorandum letter of his own. Marino wrote Downs on June 18, 1998, directing him to remove immediately all materials "related to the subject of 'Redefining the Family'" that were posted on the bulletin board across from Downs's classroom. In his letter, Marino noted that neither he nor the District had approved Downs's materials, that the materials were "divisive and disrespectful of the rights of" several Leichman High staff, and that "[r]ecognition of Gay and Lesbian Awareness Month is an approved District activity and District approved materials are used on the bulletin board in the main hallway as part of the activities."

### Procedural Background

In response to his perceived affront, Downs filed suit against LAUSD on November 30, 1998. On March 24, 1999, LAUSD moved for summary judgment. In response to this first motion for summary judgment, the district court concluded that Leichman High's bulletin boards constituted a nonpublic forum, and that the case fit within the "school-sponsored speech" rubric established by the Supreme Court in *Hazelwood School District v.*

*Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). Working from that premise, the district court concluded that the applicable First Amendment test was whether LAUSD's actions were "reasonably related to legitimate pedagogical concerns," *see id.* at 273, 108 S.Ct. 562, but also found that the factual record was not developed enough at that time to rule in favor of LAUSD on summary judgment. The court denied LAUSD's motion.

Following some development of the record, the district court granted LAUSD's second motion for summary judgment, filed on July 1, 1999. The court reiterated its earlier legal conclusions regarding definition and characterization of the forum. In addition, the court determined that "tolerance" was a legitimate pedagogical concern, and that no reasonable fact-finder could find that LAUSD "exceeded its broad discretion in implementing its legitimate pedagogical [sic] approach."

The court rejected Downs's argument that even under *Hazelwood,* a school's restrictions on speech "reasonably related to legitimate pedagogical concerns" must still be viewpoint-neutral. The court cited language in *Rosenberger v. Rector & Visitors of the University of Virginia,* 515 U.S. 819, 834, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), for the proposition that the Supreme Court "appear[ed] to have recognized [that] the traditional discussions of viewpoint discrimination do not fit well into the analysis of a school's decision to prohibit student or teacher speech related to the curriculum." The district court consequently held that "[j]ust as a school could prohibit a teacher from posting racist material on a bulletin board designated for Black History Month, [LAUSD] may prohibit [Downs] from posting intolerant materials during 'Gay and Lesbian Awareness Month.'" Finally, the court indicated, in dicta, its belief that even if viewpoint-neutrality principles were implicated in the case, LAUSD had not "advanced" the gay and lesbian lifestyle, but had in-

stead engaged in the legitimate pedagogical interest of teaching tolerance.

## Discussion

■ We review a grant of summary judgment de novo. *Robi v. Reed*, 173 F.3d 736, 739 (9th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 375, 145 L.Ed.2d 293 (1999). We must determine, viewing the evidence in the light most favorable to Downs, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Berry*, 175 F.3d at 703.

In order to decide whether the district court applied the substantive law to Downs's claim correctly, we must decide whether his postings on Leichman High's bulletin boards warranted any First Amendment protection. If so, we would have to assess what type of protection the First Amendment provides and whether LAUSD deprived Downs of that protection. Premised on our conclusion that the bulletin boards contained only "government speech," we conclude that Downs had no First Amendment right to dictate or to contribute to the content of that speech. Thus, LAUSD did not act unconstitutionally in removing Downs's materials or in ordering that the materials be removed. In summary, the district court's analysis of the issue it addressed was correct.

### A. Whose Speech Was It?

■ The First Amendment declares that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. When an individual speaks, the government's ability to regulate that speech depends in some situations on the designation of the forum in which the individual chooses to speak. *See, e.g., Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 964 (9th Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000). The two cases most closely related to our case that have developed this principle in a school setting are *Hazelwood* and *Planned Parenthood v. Clark County School District*, 941 F.2d 817 (9th Cir.1991) (en banc). Notwithstanding that those two cases help frame our discussion, we begin our analysis by explaining why they do not ultimately dictate our decision.

■ Although "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the school house gate," *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506–07, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), where that speech or expression begins to implicate the school as speaker, First Amendment rights have been limited. *See, e.g., Hazelwood*, 484 U.S. at 270–73, 108 S.Ct. 562 (dealing specifically with student speech); *Planned Parenthood*, 941 F.2d at 828–29 (outside organization's attempt to advertise in school publications); *see also DiLoreto*, 196 F.3d at 969 n. 5 ("The Supreme Court has made clear that the question whether the First Amendment requires a school to tolerate certain speech, such as the speech of students, is different from the question whether the First Amendment requires a school to promote or endorse another's speech."). Cases have identified this lesser-protected type of speech as "school-sponsored speech" or speech that will likely bear the "imprimatur" of the school. *Hazelwood* and *Planned Parenthood* are the two foremost examples of cases drawing this distinction.

In *Hazelwood*, a high school principal removed from a school newspaper two pages containing an article describing some of the school's students' experiences with pregnancy and an article discussing the impact of divorce on a number of the school's students. 484 U.S. at 263, 108 S.Ct. 562. After concluding that the school newspaper was a nonpublic forum, the Court determined that school officials could regulate the newspaper's contents in "any reasonable manner." *Id.* at 270, 108 S.Ct. 562. The Court then distinguished between toleration of student speech—addressed in *Tinker*—and the affirmative or

perceived promotion or sponsorship of student speech. *Id.* at 270–71, 108 S.Ct. 562. "The latter question," the Court wrote

> concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

*Id.* at 271, 108 S.Ct. 562. The Court determined that educators' authority in this area enabled them to "assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *Id.*

Pursuant to this analysis, the *Hazelwood* Court declared that a school may "disassociate itself ... from speech that is, for example, ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences." *Id.* (internal quotations and citations omitted). In addition, schools

> retain the authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with the shared values of a civilized social order, or to associate the school with any position other than neutrality on matters of political controversy.

*Id.* at 272, 108 S.Ct. 562 (internal quotations and citations omitted). The school principal's actions in *Hazelwood* survived constitutional scrutiny because his "editorial control over the style and content of student speech in school-sponsored expressive activities [was] reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 S.Ct. 562. The Court indicated that the same principles would govern a school's ability to regulate a teacher's speech that might be seen to bear the imprimatur of the school. *Id.* at 267, 108 S.Ct. 562; *see also Planned Parenthood,* 941 F.2d at 827.

Three years later, an en banc panel of this Circuit decided a similar school "imprimatur" case in *Planned Parenthood,* 941 F.2d 817. The case involved school educators' refusals to accept advertisements for Planned Parenthood in student newspapers, yearbooks, and athletic programs. *Id.* at 819. Like *Hazelwood, Planned Parenthood* dealt with an issue of school sponsorship. *Id.* Also like *Hazelwood,* the *Planned Parenthood* court decided that the school had created only a nonpublic forum in its acceptance of advertisements. *Id.* at 825.

Despite the absence of express "viewpoint neutrality" discussion anywhere in *Hazelwood,* the *Planned Parenthood* court incorporated "viewpoint neutrality" analysis into nonpublic forum, school-sponsored speech cases in our Circuit.[2] *See id.* at 828

---

**2.** We note that the circuits are currently split on this question. *Compare C.H. v. Oliva,* 195 F.3d 167, 172–73 (3d Cir.) (*"Hazelwood* clearly stands for the proposition that educators may impose non-viewpoint neutral restrictions on the content of student speech in school-sponsored expressive activities so long as those restrictions are reasonably related to legitimate pedagogical concerns.... [T]he requirement of viewpoint neutrality, while essential to the analysis of a school's restrictions on extracurricular speech ... is simply not applicable to restrictions on the State's own speech."), *reh'g en banc granted, opinion vacated,* 197 F.3d 63 (1999), *and Ward v. Hickey,* 996 F.2d 448, 454 (1st Cir.1993) ("[T]he court in [*Hazelwood* ] did not require that school regulation of school-sponsored speech be viewpoint neutral."), *with Kincaid v. Gibson,* 191 F.3d 719, 727 (6th Cir.) (stating, curiously, that *Hazelwood* "noted" that non-viewpoint-based restrictions were part of its analysis), *reh'g granted, opinion vacated,* 197 F.3d 828 (1999), *and Searcey v. Harris,* 888 F.2d 1314, 1319 & n. 7 (11th Cir.1989) (*"Hazelwood* ... does not alter the test for reasonableness in a nonpublic forum such as

n. 19, 829–30. *But see Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 529 (9th Cir.1992) (indicating in dicta, without any mention of "viewpoint neutrality," that *Hazelwood* holds that "federal courts are to defer to a school's decision to suppress or punish vulgar, lewd, or plainly offensive speech, and to 'disassociate itself' from speech that a reasonable person would view as bearing the imprimatur of the school, when the decision is 'reasonably related to legitimate pedagogical concerns.' "). Thus, were Downs's case a case of school-sponsored or imprimatur speech in a nonpublic forum—as the district court concluded—we would necessarily be compelled by *Planned Parenthood* to review LAUSD's actions through a viewpoint neutrality microscope.

 Viewpoint neutrality, however, does not apply to LAUSD's actions in this case. This case is not controlled by *Hazelwood* or *Planned Parenthood* because it is a case of the government itself speaking, whether the government is characterized as Leichman High, LAUSD, or the school board. It is not a case involving the risk that a private individual's private speech might simply "bear the imprimatur" of the school or be perceived by outside individuals as "school-sponsored." Rather than focusing on what members of the public might perceive Downs's speech to be, in this case we find it more helpful to focus on who actually was responsible for the speech on Leichman High's Gay and Lesbian Awareness bulletin boards.

Only school faculty and staff had access to post materials on these boards. While these faculty and staff members may have received materials from outside organizations, the faculty and staff members alone posted material on the bulletin boards, and at all times their postings were subject to the oversight of the school principals. Although much, if not all, of what Downs

posted appeared on the bulletin board directly across the hall from his assigned classroom, the proximity of the board to his classroom detracts in no way from the conclusion that the bulletin board, like all others in Leichman High's halls, were the property and responsibility of Leichman High and LAUSD. That Leichman High's principals do not spend the majority of their days roaming the school's halls strictly policing—or, in Downs's point of view, censoring—the school's bulletin boards does not weaken our conclusion that there is no genuine issue of material fact concerning whether Olmsted and Marino had the authority to enforce and give voice to school district and school board policy. Inaction does not necessarily demonstrate a lack of ability or authority to act.

No admissible evidence refutes Olmsted's and Marino's assertions that they had authority over the bulletin boards' content at all times. Downs submitted a declaration from Earnest Scarcelli, formerly employed as a principal by LAUSD. Scarcelli stated that he had "no recollection of any unwritten district-wide policy that states that whenever a principal permits something to remain posted or displayed on bulletin boards, display cases or classrooms [sic] the material becomes officially approved by the district." Scarcelli also "believe[d] that it would be impossible for the principal of a large school to constantly keep track of bulletin boards, to the extent that if something were go [sic] unnoticed and be displayed for a period of time that it would necessarily become officially approved by the district." Scarcelli's declaration does not create a triable issue of fact on the authority of school principals as site administrators of school district policy. According to Mr. Scarcelli, he retired as an LAUSD school principal as of 1992, well before the relevant events un-

a school but rather provides the context in which the reasonableness of regulations should be considered.... [T]here is no indication that the [*Hazelwood*] Court intended to drastically rewrite First Amendment law to allow a school official to discriminate based

on a speaker's views."); *id.* at 1325 ("Without more explicit direction, we will continue to require school officials to make decisions relating to speech which are viewpoint neutral.").

derlying this case. Thus, his declaration is of no value whatsoever, evidentiary or otherwise.

Olmsted's and Marino's implicit acceptance of other material posted by school faculty and staff that remained on the bulletin boards was equivalent to Leichman High, LAUSD, and the school board itself speaking. *Cf. Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) ("When a public broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity.... Although programming decisions often involve the compilation of the speech of third parties, the decisions nonetheless constitute communicative acts."). Conversely, Olmsted's and Marino's explicit rejection of Downs's posted adversarial materials was equivalent to Leichman High, LAUSD, and the school board itself either choosing not to speak or speaking through the very act of removal. The important point is that any speech on the bulletin boards was directly traceable to LAUSD and the school board through Olmsted's and Marino's enforcement of LAUSD and school board policy.

Because the school district and the school board were in fact responsible for 1) the recognition of Gay and Lesbian Awareness month and 2) the content of the bulletin boards through school principals' oversight, this case is clearly distinguishable from cases involving student-written articles in a school-sponsored newspaper or an outside organization's advertisements in school-sponsored student newspapers, yearbooks, and athletic programs. *See Hazelwood*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592; *Planned Parenthood*, 941 F.2d 817; *see also Lacks v. Ferguson Reorganized Sch. Dist. R–2*, 147 F.3d 718, 724 (8th Cir.1998) (termination of teacher who allowed students to use profanity in classroom plays and poems treated as case of educators' editorial control over "school-sponsored expressive activities"); *Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.*, 42 F.3d 719, 723–24 (2d Cir.1994) (guest lecturer's showing of film including bare-chested women to tenth-grade mathematics class treated as school sponsored speech subject to *Hazelwood* analysis); *Miles v. Denver Pub. Sch.*, 944 F.2d 773, 774–76 (10th Cir.1991) (teacher's in-class comment on school rumor treated as "school-sponsored expression in a nonpublic forum"). Furthermore, unlike the University of Virginia in *Rosenberger*, there is no evidence that LAUSD made an affirmative effort to disclaim responsibility for the content of the bulletin boards. *See* 515 U.S. at 834–35, 115 S.Ct. 2510 ("The distinction between the University's own favored message and the private speech of students is evident in the case before us.... The University declares that the student groups eligible for [Student Activity Fund] support are not the University's agents, are not subject to its control, and are not its responsibility.").

We do not face an example of the government opening up a forum for either unlimited or limited public discussion. Instead, we face an example of the government opening up its own mouth: LAUSD, by issuing Memorandum No. 111, and Leichman High, by setting up the Gay and Lesbian Awareness bulletin boards. The bulletin boards served as an expressive vehicle for the school board's policy of "Educating for Diversity." *Cf. Steirer v. Bethlehem Area Sch. Dist.*, 987 F.2d 989, 993 (3d Cir.1993) ("The gamut of courses in a school's curriculum necessarily reflects the value judgments of those responsible for its development, yet requiring students to study course materials, write papers on the subjects, and take the examinations is not prohibited by the First Amendment."), *abrogated on other grounds by Troster v. Pennsylvania State Dep't of Corrections*, 65 F.3d 1086, 1087, 1090 (3d Cir.1995). Because the bulletin boards were a manifestation of the school board's policy to promote tolerance, and because Olmsted and Marino had final authority over the content of the bulletin boards, all speech that occurred on the bulletin boards was the school board's and LAUSD's speech.

## B. To What Extent Can the Government Control Its Own Speech?

Now that we have concluded that this case involves government speech in a nonpublic forum, we must decide to what extent the First Amendment allows others to interfere with it. *See Knights of the Ku Klux Klan v. Curators of the Univ. of Mo.*, 203 F.3d 1085, 1094 n. 11 (8th Cir.2000) (refusing to decide whether speech's status as "government speech" is enough to preclude forum analysis altogether), *cert. denied*, —— U.S. ——, 121 S.Ct. 49, —— L.Ed.2d —— (2000). We conclude that when a public high school is the speaker, its control of its own speech is not subject to the constraints of constitutional safeguards and forum analysis, but instead is measured by practical considerations applicable to any individual's choice of how to convey oneself: among other things, content, timing, and purpose. Simply because the government opens its mouth to speak does not give every outside individual or group a First Amendment right to play ventriloquist. As applied here, the First Amendment allows LAUSD to decide that Downs may not speak as its representative. This power is certainly so if his message is one with which the district disagrees.

Although "[i]t is axiomatic that the government may not *regulate* speech based on its substantive content or the message it conveys," *Rosenberger*, 515 U.S. at 828, 115 S.Ct. 2510 (emphasis added), "when the State is the speaker, it may make content-based choices." *Id.* at 833, 115 S.Ct. 2510; *see also Rust v. Sullivan*, 500 U.S. 173, 194–200, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (upholding federal regulations prohibiting recipients of Title X grants from promoting or advocating abortion as a method of family planning); *Knights of the Ku Klux Klan*, 203 F.3d at 1094 & n. 11 (in public broadcasting case dealing with outside organization's desire to donate funds to broadcaster and thereby mandate broadcaster's on-air recognition of such donation, stating that "[a]s speaker, [the university-public broadcaster] exercises control not only over the decision to accept or reject the donations, but also over the form and content of the announcements themselves."); *Steirer*, 987 F.2d at 994, 997 ("The mere fact that [a public high school's] course content itself reflects a particular ideology does not necessarily trench upon First Amendment protections."); *Muir v. Alabama Educ. Television Comm'n*, 688 F.2d 1033, 1044 (5th Cir.1982) (en banc) (in the context of state-owned-and-operated public television stations, stating that "the First Amendment does not prohibit the government, itself, from speaking, nor require the government to speak. Similarly, the First Amendment does not preclude the government from exercising editorial control over its own medium of expression."). *Accord Forbes*, 523 U.S. at 674, 676–78, 682, 118 S.Ct. 1633 (after specifically indicating that public broadcaster's broadcast was "by design a forum for political speech by the candidates," holding that broadcaster must make broadcasting decisions in viewpoint-neutral manner); *Edwards v. California Univ. of Pa.*, 156 F.3d 488, 490–92 (3d Cir.1998) (adhering to *Rosenberger*'s "content-based" language in curriculum case, but doing so in a way that allowed public university to prevent professor from "advancing [his] religious beliefs through his lectures and handouts"), *cert. denied*, 525 U.S. 1143, 119 S.Ct. 1036, 143 L.Ed.2d 44 (1999). *Forbes*, in fact, recognized this proposition: "Much like a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school prescribing its curriculum, a broadcaster by its nature will facilitate the expression of some viewpoints instead of others." 523 U.S. at 674, 118 S.Ct. 1633.

When the government is formulating and conveying its message, "it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted" by its individual messengers. *Rosenberger*, 515 U.S. at 833, 115 S.Ct. 2510. For example, a government's

administration will not just make a decision to talk about taxes. It will have a viewpoint on the utility of taxes, and there is no constitutional reason why it should not be able to convey that message with clarity. *See National Endowment for the Arts v. Finley*, 524 U.S. 569, 598, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (Scalia, J., concurring) ("It is the very business of government to favor and disfavor points of view on (in modern times, at least) innumerable subjects—which is the main reason we have decided to elect those who run the government, rather than save money by making their posts hereditary.... None of this has anything to do with abridging anyone's speech.").

■■■■■■ An arm of local government— such as a school board—may decide not only to talk about gay and lesbian awareness and tolerance in general, but also to advocate such tolerance if it so decides, and restrict the contrary speech of one of its representatives. *Cf. Rust*, 500 U.S. at 194, 111 S.Ct. 1759 ("To hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals, would render numerous Government programs constitutionally suspect."). *Rosenberger* supports this notion. Shortly after the Court stated that the government may make "content-based choices" as speaker, the Court also declared, with reference to the facts of that case, that "[a] holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech which is controlled by different principles." *Rosenberger*, 515 U.S. at 834, 115 S.Ct. 2510 (citing, among others, *Hazelwood*); *see also Board of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 120 S.Ct. 1346, 1357, 146 L.Ed.2d 193 (2000) ("Where the University speaks, either in its own name through its regents or officers, or in myriad other ways through its diverse faculties, the analysis likely would be altogether different [from traditional viewpoint neutrality analysis].").

At oral argument, Downs asserted that his case is indistinguishable from *Rosenberger* because, he alleges, LAUSD invited a variety of viewpoints on gay and lesbian issues. Downs, of course, is correct in his argument that his postings "focused on gay and lesbian issues," as contemplated by Memorandum No. 111. If we myopically limited Memorandum No. 111's message to that phrase, we might agree with Downs that this case would be indistinguishable from *Rosenberger* as inviting a myriad of viewpoints on a single topic of discussion, and thus requiring forum analysis. *See* 515 U.S. at 824, 837, 115 S.Ct. 2510 (striking down university's decision not to subsidize publications with religious editorial viewpoints in light of a university mandate making such subsidies available to all student organizations "related to the educational purpose of the University"). However, that Downs's postings did indeed "focus on gay and lesbian issues" does not mean that they satisfied all aspects of LAUSD's policy as announced in Memorandum No. 111.

In addition to inviting a "focus on gay and lesbian issues," Memorandum No. 111 made clear that it was "the District's multicultural and human relations education policy" to "Educat[e] for Diversity," and that this included the expectation that all students would be given equal access to a quality education and the academic and social activities of the school. The policy also made clear a focus on "foster[ing] a climate that reduces fears related to difference and deters name-calling and acts of violence or threats motivated by hate and bigotry." In LAUSD's view, Downs's contributions to the bulletin boards harmed, rather than helped, the promotion of tolerance for and appreciation of diversity.

Moreover, Downs had notice that he was not dealing with a situation in which the government had opened up a forum inviting private speech and debate. In fact, Downs had continuous notice that he was

violating district policy, even if he could successfully argue that Memorandum No. 111 was ambiguous regarding what it allowed him to contribute to Gay and Lesbian Awareness month in the school. Olmsted and Marino, as representatives of the elected school board, informed him that he was not conveying the government's chosen message, and that as long as he was employed by LAUSD, he was expected to adhere to the district's policy. Estrada–Melendez, LAUSD's legal counsel, informed Downs that the bulletin boards were not "free speech zones."

Were we to invoke the Constitution to protect Downs's ability to make his voice a part of the voice of the government entity he served, Downs would be able to do to the government what the government could not do to Downs: compel it to embrace a viewpoint. *See Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557, 573–74, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) ("[T]he fundamental rule of protection under the First Amendment [is] that a speaker has the autonomy to choose the content of his own message."); *Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (striking down state criminal law forbidding New Hampshire citizens from covering up state motto "Live Free or Die" on license plates as violative of "right to refrain from speaking"); *West Virginia Bd. of Educ. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (invalidating school board resolution requiring teachers and students to participate in flag salute). Indeed, not only would the government be compelled to speak, but Downs's citation to passages from the Bible might present Establishment Clause problems.

Our narrow decision does not conflict with the Supreme Court's plurality decision in *Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982). *Pico* dealt with a school district's decision to remove several books from a school library. *Id.* at 856–58, 102 S.Ct. 2799; *see also Monteiro v. Tempe Union High Sch.*

*Dist.,* 158 F.3d 1022, 1028–31 & n. 13 (9th Cir.1998) (student's First Amendment rights violated by removal—because of threats of damages, lawsuits, and other forms of retaliation—from mandatory reading list of books determined by the school district to have legitimate educational value); *Pratt v. Independent Sch. Dist. No. 831, Forest Lake, Minn.,* 670 F.2d 771, 773 (8th Cir.1982) (school board's removal of material from classroom curriculum based solely on material's message is unconstitutional). In *Pico,* the court made clear at the outset that the respondents in that case did not seek

> to impose limitations upon their school Board's discretion to prescribe the curricula of the Island Trees schools. On the contrary, the only books at issue in this case are library books, books that by their nature are optional rather than required reading. Our adjudication of the present case thus does not intrude into the classroom, or into the compulsory courses taught there.

*Pico,* 457 U.S. at 862, 102 S.Ct. 2799. Thus, when the Court held that local school boards could not remove books from school library shelves simply because they disliked the ideas contained in the books, *id.* at 872, 102 S.Ct. 2799, the Court was not faced with a case of "school board speech" or "government speech." Instead, the Court declared, the school board's "duty to inculcate community values" was misplaced as a defense in that case where the board "attempt[ed] to extend [its] claim of absolute discretion beyond the compulsory environment of the classroom, into the school library and the regime of voluntary inquiry that there holds sway." *Id.* at 869.

Whether or not the bulletin boards by themselves may be characterized as part of the school district's "curriculum" is unimportant, because curriculum is only one outlet of a school district's expression of its policy. Nevertheless, our decision is consistent with cases holding that school teachers have no First Amendment right

to influence curriculum as they so choose. *See, e.g., Edwards,* 156 F.3d at 491–92 (holding that professor has no First Amendment right to compel university to allow him to teach class from religious perspective); *Boring v. Buncombe County Bd. of Educ.,* 136 F.3d 364, 370–71 (4th Cir.1998) (en banc) (teacher's choice of play not constitutionally-protected speech); *Bradley v. Pittsburgh Bd. of Educ.,* 910 F.2d 1172, 1176 (3d Cir.1990) (holding that teacher has no First Amendment right to employ classroom teaching methodology of choice); *Kirkland v. Northside Indep. Sch. Dist.,* 890 F.2d 794, 795 (5th Cir.1989) (teacher's choice of supplemental reading list not constitutionally-protected speech); *see also Monteiro,* 158 F.3d at 1030 n. 13 ("Although the complaint does not refer to the involvement of teachers in the teaching of the literary works at issue or in the formation of the curriculum, it is likely that claims such as these, and their outcomes, could have significant effect on the First Amendment rights of teachers.").

In order for the speaker to have the opportunity to speak as the government, the speaker must gain favor with the populace and survive the electoral process. *See Southworth,* 120 S.Ct. at 1357 ("When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position."). The LAUSD school board is elected by the public, and until its current members are voted out of office, they "speak" for the school district through the policies they adopt. Furthermore, in the case of the typical school board, influence from the community does not end at the ballot box, but continues through publicly-held school board meetings at which parents and other interested parties may express satisfaction or dissatisfaction with the school board's policies or "speech." This is reflected in this case by Memorandum No. 111's acknowledgment that community groups had participated in a review of the posters and materials LAUSD sent to each of the schools for Gay and Lesbian Awareness month.

The district court in this case noted that "[j]ust as a school could prohibit a teacher from posting racist material on a bulletin board designated for Black History Month, [LAUSD] may prohibit [Downs] from posting intolerant materials during 'Gay and Lesbian Awareness Month.'" The Supreme Court has recognized a similar principle in the context of the government's ability to regulate its employees' speech and discipline those employees for that speech. In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Court noted that the "State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* at 568, 88 S.Ct. 1731 (1968).

Our holding, however, does not prevent Downs from propounding his own opinion on the morality of homosexuality. Subject to any applicable forum analysis, he may do so on the sidewalks, in the parks, through the chat-rooms, at his dinner table, and in countless other locations. *Cf. Rust,* 500 U.S. at 198, 111 S.Ct. 1759 ("Individuals who are voluntarily employed for a Title X project must perform their duties in accordance with the regulation's restrictions on abortion counseling and referral. The employees remain free, however, to pursue abortion-related activities when they are not acting under the auspices of the Title X project."); *Edwards,* 156 F.3d at 491 ("[A]lthough Edwards has a right to advocate outside of the classroom for the use of certain curriculum materials, he does not have a right to use those materials in the classroom."). He may not do so, however, when he is speaking as the government, unless the government allows him to be its voice.

### Conclusion

We hold that when the school district speaks through bulletin boards that are

not "free speech zones," but instead are vehicles for conveying a message from the school district, the school district may formulate that message without the constraint of viewpoint neutrality. Here, LAUSD, an arm of local government, is firmly policing the boundaries of its own message. As such, LAUSD did not violate Downs's First Amendment free speech rights. Because we determine that Downs has no First Amendment right to speak for the government, his equal protection claim based upon the deprivation of this asserted right also fails to withstand summary judgment.

The district court's grant of summary judgment in favor of LAUSD is AFFIRMED.