**In re WASHINGTON STATE APPLE ADVERTISING COMMISSION**

No. CS–01–0278–EFS.

United States District Court,
E.D. Washington.

March 31, 2003.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

SHEA, District Judge.

On March 18, 2003, the Court heard argument on the parties Cross–Motions for Summary Judgment, (Ct. Recs. 214; 223), The Court also considered the Organic Intervening Defendants' Motion to Join in Defendant's Motion for Summary Judgment, (Ct.Rec.238). The Washington State Apple Advertising Commission ("the Commission")[1] was represented at the hearing James M. Danielson, and Peter A. Spadoni. The named Defendants were represented by represented by Robert Llewellyn Parlette. The Organic Intervening Defendants were represented by Brian C. Leighton and David Bohr. The other Intervening Defendants, Borton & Sons, Inc., Washington Fruit & Produce Co. and Evans Fruit Co., were represented at the hearing by Brendan V. Monahan. This Order **grants in part** the motions of the Defendants and **denies** the Commission's Motion. As a result of the Court's rulings herein, the Court enters complete summary judgment dismissing the Commissions' claims, and enters partial summary judgment granting declaratory relief

that the Commission's collection of assessments is unconstitutional. Therefore, trial appears unnecessary as to most issues.

## I. FACTUAL BACKGROUND

The facts relevant to these motions are not in dispute. The statutory structure of the Commission, its activities, and the network of regulation surrounding the Washington apple market are record facts not subject to inference or contravention. Instead, the parties sharply dispute the legal conclusions and consequences that flow from these facts. Before the Commission was created, Washington only grew fifteen percent (15%) of the nation's apples. (Ct. Rec. 165 Decl. of Welcome Sauer Re the Apple Commission Programs ¶ 2.) Today, Washington apple growers sell seventy percent (70%) of all fresh-market apples grown in the United States. (*Id.*)

The Court finds that the facts contained herein are undisputed. The Commission was created as a corporate body. RCW 15.24.070. It has the power to administer and enforce the provisions of the chapter creating it, RCW 15.24.070(2); to incur expense and enter into contracts, and to create such liabilities as may be reasonable for the proper administration of justice and enforcement of that chapter; RCW 15.24.070(4); to investigate and prosecute violations, RCW 15.24.070(5); to conduct scientific research, RCW 15.24.070(6); to sue and be sued, adopt a corporate seal and have all the powers of a corporation, RCW 5.24.070(8). RCW 15.24.070. The State of Washington is not liable for the

---

1. After the commencement of this litigation, the Washington State Legislature amended the statutes governing the Apple Advertising Commission. Those amendments, effective July, 2002, among other things, changed the name of the Commission to the Apple Commission. RCW 15.24.010. This order will refer to the Commission as the Apple Advertising Commission because in the original

caption for this case, that was the Commission's name. Moreover, this Court has previously ordered the caption of this case be amended to In Re Washington Apple Advertising Commission. The Court's use of the old name is for clarity alone, and should not be construed as expressing an opinion on the Commission's activities or the ultimate resolution of this case.

Commission's debts or actions. RCW 15.24.190. The Commission is not answerable to the State of Washington, or any of its political subdivisions.

The Commission is composed nine apple producers, engaged in growing or producing apples in Washington for at least five years, RCW 15.24.020, and four apple dealers actively engaged in handling, shipping, buying or selling of apples in Washington for at least five years, *id.* The Director of the Department of Agriculture, is also an ex officio member of the Commission, without vote other formal powers. *Id.*

The Commission is subject to annual audit by the State Auditor. (Ct. Rec. 165 Decl. of Welcome Sauer Re the Apple Commission Programs ¶ 14.) The Commission's employees are subject to ethics rules applicable to Washington State employees, are protected by the job security restrictions applicable to Washington State employees, and are covered by the Washington Public Employee Retirement System. (*Id.*) The Commission further asserts that it is subject to the Open and Public Meetings Act, and the Washington Administrative Procedures Act. (*Id.* Ex. C.)

The Washington State Legislature has declared the purposes for which it created the Commission:

This chapter is passed:

(a) In the exercise of the police power of the state to assure, through this chapter, and other chapters, that the apple industry is highly regulated to protect the public health, to prevent fraudulent practices, to promote the welfare of the state, and to stabilize and protect the apple industry of the state as a vital and integral part of its economy for the benefit of all its citizens;

(b) Because the apple crop grown in Washington comprises one of the major agricultural crops of Washington, and that therefore the business of selling and distributing such crop and the expanding and protection of its market is of public interest;

(c) Because it is necessary and expedient to enhance the reputation of Washington apples in domestic and foreign markets;

(d) Because it is necessary to discover the health giving qualities and food and dietetic value of Washington apples, and to spread that knowledge throughout the world in order to increase the consumption of Washington apples;

(e) Because Washington grown apples are handicapped by high freight rates in competition with eastern and foreign grown apples in the markets of the world, and this disadvantage can only be overcome by education and advertising;

(f) Because the stabilizing and promotion of the apple industry, the enlarging of its markets, and the increasing of the consumption of apples are necessary to assure and increase the payment of taxes to the state and its subdivisions, to alleviate unemployment within the state, and increase wages for agricultural labor;

(g) To disseminate information giving the public full knowledge of the manner of production, the cost and expense thereof, the care taken to produce and sell only apples of the finest quality, the methods and care used in preparing for market, and the methods of sale and distribution to increase the amount secured by the producer therefor, so that they can pay higher wages and pay their taxes, and by such information to reduce the cost of distribution so that the spread between the cost to the consumer and the amount received by the producer will be reduced to the minimum absolutely necessary; and

(h) To protect the general public by educating it in reference to the various

varieties and grades of Washington apples, the time to use and consume each variety, and the uses to which each variety should be put.

RCW 15.24.900(1). The Washington State Legislature also decreed a specific purpose for the Commission, which is charged to:

provide for and conduct a comprehensive and extensive research, advertising, and educational campaign as continuous as the crop, sales, and market conditions reasonably require. It shall investigate and ascertain the needs of producers, conditions of the markets, and extent to which public convenience and necessity require research and advertising to be conducted.

RCW 15.24.080.

The Commission funds its activities by assessing all growers and producers of Washington apples, RCW 15.24.100. In the years 1998–99 through 2001–02, the Commission spent between 62.5% and 85% of its budget expenditures were spent on "marketing" activities. (Ct. Rec. 219, Decl. Of Erik K. Wahlquist Ex. G.) Those same spreadsheets reflect that while not all of that budget is allocated to "consumer advertising," the vast majority of "marketing" expenditures fits within four categories: (1) publications; (2) trade advertising; (3) consumer advertising; and (4) promotions.

The Commission itself only administers the statutes and regulations of its chapter, RCW 15.24.070. It does not administer or enforce the other chapters of Revised Code of Washington, Title 15, relating to Agriculture and Marketing. *See id.* Nor does the Commission administer or enforce other applicable state and federal regulations. *See id.* Further the Commission's assessments only fund Commission activities, RCW 15.24.100, and not any other state or federal programs, *see id.* While not tied to the Commission, nor funded by its assessments, the Washington apple industry is constrained by a number of regulations. On the production side, the regulations affecting Washington apple producers include:

1. The Washington State Department of Agriculture's Organic Program;

2. The WSDA's Pest Program;

3. The WSDA's Pesticide Registration Program;

4. The WSDA's Food Safety Program;

5. The WSDA's Fruit and Vegetable Inspection Program; and

6. The Organic Food Products Act.

(Ct. Rec. 118, Expert Report of Jim Jesernig). On the packing and shipping side, the regulations include:

1. Washington State Standards for Grades and Packs;

2. Controlled Atmosphere Storage of Fruits and Vegetables;

3. The USDA's Animal/Plant Health Inspection Service; and

4. The USDA's Agricultural Marketing Service, which administers the Perishable Agricultural Commodities Act and U.S. Grandes and Standards for apples.

(*Id.*) On the marketing side, a producer or dealer wishing to sell internationally is constrained by various federal pesticide laws, the phytosanitary protocols imposed by foreign countries, foreign tariffs and value added taxes, and anti-dumping laws in Mexico. (*Id.*) Further, the Washington state legislature has found: "That the apple industry is a highly regulated industry and that this chapter and the rules adopted under it are only one aspect of the regulation of the industry. Other regulations and restraints applicable to the apple industry include ...." RCW 15.24.900(2)(d) (list omitted). According to the President of the Commission, the Washington apple industry is not subject to marketing orders, by the Commission or any other body, (Ct. Rec. 219 Decl. of Eric

Wahlquist, Ex. A, Depo. of Welcome Sauer at 83:22–84:12), producers make their own marketing decisions, (*id.* at 84:13–15); no mandatory organization sets the price for Washington apples, (*id.* at 86:19–88:16), there are no quantity controls, quotas or market allocations, (*id.* at 82:1–8; 90:4–12). Finally, Mr. Sauer asserts that Washington apple market is heavily sensitive to both supply and demand, both of which impact the prevailing market price. (Ct. Rec. Ct. Decl. of Welcome Sauer Re the Apple Commission Programs ¶ 3.)

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment will be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When considering a motion for summary judgment, a court may not weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists only if "the evidence is such that a reasonable jury could return a verdict" for the party opposing summary judgment. *Id.* at 248, 106 S.Ct. 2505. In other words, issues of fact are not material and do not preclude summary judgment unless they "might affect the outcome of the suit under the governing law." *Id.* There is no genuine issue for trial if the evidence favoring the non-movant is "merely colorable" or "not significantly probative." *Id.* at 249, 106 S.Ct. 2505.

If the party requesting summary judgment demonstrates the absence of a genuine material fact, the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial" or judgment may be granted as a matter of law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. This requires the party opposing summary judgment to present or identify in the record evidence sufficient to establish the existence of any challenged element that is essential to that party's case and for which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Failure to contradict the moving party's facts with counter affidavits or other responsive materials may result in the entry of summary judgment if the party requesting summary judgment is otherwise entitled to judgment as a matter of law. *See Anderson v. Angelone,* 86 F.3d 932, 934 (9th Cir.1996).

## III. Discussion

In 1937, the Washington State legislature, recognizing that apples are one of Washington's major agricultural crops, RCW 15.24.900(1)(b), and the importance of the apple industry to the Washington economy, RCW 15.24.900(1)(f), was concerned that Washington grown apples were handicapped by high freight rates in competition with eastern and foreign grown apples, RCW 15.24.900(1)(e). In order to overcome that disadvantage, *id.,* as well for other reasons, *see* RCW 15.24.900(1), the legislature created the Washington Apple Advertising Commission, currently known as the Washington State Apple Commission The enabling statute allowed the Commission to assess one cent on each box of apples packed for fresh market; today's growers pay 25 cents per box. RCW 15.24.090. Those assessments pay for advertising, educational campaigns, and research, among other things. RCW 15.24.080.

At the time of the Commission's founding, the Supreme Court had clearly held

that the Fourteenth Amendment did not apply the Bill of Rights, the First Amendment included, to the states, but rather protected those rights implicit in the concept of ordered liberty. *See e.g. Twining v. New Jersey,* 211 U.S. 78, 99, 29 S.Ct. 14, 53 L.Ed. 97 (1908); *see also Adamson v. California,* 332 U.S. 46, 68 67 S.Ct. 1672, 91 L.Ed. 1903 (1947) (Black, J., dissenting) (defending the view that the Fourteenth Amendment Due Process Clause incorporates all protections of the Bill of Rights). Nevertheless, one of the first rights to be deemed fundamental and applied against the states was the First Amendment freedom of speech. *See e.g. Gitlow v. People of New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1925) ("[W]e may and do assume that freedom of speech and of the press—which are protected by the First Amendment from abridgment by Congress—are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States.").

While *Gitlow,* decided in 1925, twelve years before the founding of the Commission, provided the initial hint that the protections afforded free speech under the First Amendment would be applied to the States, the first Supreme Court case recognizing the right to be free of compelled speech, *West Virginia State Board of Education v. Barnette,* was not decided until 1943, where the Court held that Jehovah's Witnesses may not be compelled to salute the flag. 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). However, the Supreme Court did not rule that compelled funding of speech could violate the first Amendment until 1977. *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). In *Abood,* the Supreme Court ruled that the government

could not require public school teachers to pay fees to the school teacher's union not used for purposes germane to the reason for the union's existence. *Id.* at 235–36, 97 S.Ct. at 1800.

In 1997, the Supreme Court decided *Glickman v. Wileman Brothers & Elliott, Inc.,* 521 U.S. 457, 117 S.Ct. 2130 138 L.Ed.2d 585 (1997). There, a group of agricultural producers sought to prevent compelled assessments on their sales from being used to support advertising. The Court rejected their claims because "(1) the generic advertising of California peaches and nectarines is unquestionably germane to the purposes of the marketing orders and, (2) in any event, the assessments are not used to fund ideological activities." *Id.*

However, the Supreme Court largely limited its *Glickman* holding four years later in *United States v. United Foods, Inc.,* 533 U.S. 405, 121 S.Ct. 2334, 2341, 150 L.Ed.2d 438 (2001), which held an agricultural marketing program, funded by assessments on mushroom growers violated the First Amendment. The present litigation was filed in response to *United Foods,* seeking to clarify the constitutionality of the Commission's collection of assessments under the First Amendment, as incorporated through the Fourteenth Amendment.

## A. Issues

In these cross-motions, the parties present four issues: (1) are the Commission's activities government speech insulated from First Amendment scrutiny; (2) does the Commission exist as part of a broader, comprehensive regulatory scheme; (3) is the Commission's assessment structure a constitutionally permitted infringement on commercial speech; (4) does the Commission's assessment structure violate the Washington Constitution?[2] At argument,

---

**2.** The parties do not raise the applicability of the Tax Injunction Act, 28 U.S.C. § 1341, in

the Commission, perhaps with the Court's ruling on preliminary injunctive relief, (Ct. Rec.261), in mind, raised an additional issue; (5) if the Court determines that the Commission has violated the First Amendment, should the Court declare the Commission wholly unconstitutional or rather declare that only its "speech" activities are unconstitutional, permitting the Commission to collect assessments to fund its other activities?

### B. Government Speech

█ In holding assessments imposed under the Mushroom Promotion, Research, and Consumer Information Act unconstitutional, *United Foods* specifically refused to consider the question of whether advertising funded by mandatory assessments is government speech immune from the scrutiny applied to other compelled speech, because the Government did not raise the argument in the Court of Appeals. *United States v. United Foods, Inc.*, 533 U.S. 405, 416–17, 121 S.Ct. 2334, 2341, 150 L.Ed.2d 438 (2001). Here, the Commission asserts that because its activities are Washington State government speech, they are insulated from constitutional scrutiny. The government speech doctrine allows the government, when it elects to speak, to control its own message and make policy judgments about what it will say without offending the First Amendment rights of those who disagree with the government's message:

It is inevitable that government will adopt and pursue programs and policies within its constitutional powers but which nevertheless are contrary to the profound beliefs and sincere convictions of some of its citizens. The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies.

*Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). Thus, when speech can be characterized as government speech, the government may fund that speech without free speech concerns. There are two possible ways in which the Commission's activities might be characterized as government speech: (1) the Commission itself might be a Washington State government entity; or (2) the Commission might be an entity charged by the Washington State government with disseminating that government's speech.

█ The Court rejects the first possibility. The Commission asserts that it is simply a state agency, like an ordinary municipal corporation or regulatory agency.[3] The Commission is a corporate body, with the powers of a corporate body, including that to sue and be sued. RCW 15.24.070. The State of Washington is not liable for the Commission's debts or ac-

---

these motions. The Court adopts its ruling in the Order Granting Intervening Defendant's Motion for Preliminary Injunctive Relief, (Ct. Rec.261), on that point, as if fully set forth herein.

**3.** The Commission argues in particular it must be a state agency because *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) repeatedly calls it a state agency. This

citation is of dubious relevance as that case, decided before the earliest "government speech" opinion, *Abood*, did not address whether the Commission was a government entity for the purposes of the First Amendment. Rather, it held that the distinction between the Commission and a voluntary trade association did not deny it standing to sue on behalf of its constituents. *Id.* at 346, 97 S.Ct. at 2442. That holding has no relevance to the question at issue here.

tions. RCW 15.24.190. As discussed below, the Commission is not answerable to the State of Washington, or any of its political subdivisions. In the first Supreme Court opinion to allude to the government speech doctrine, Justice Powell sought to distinguish between a school board and a union:

> Compelled support of a private association is fundamentally different from compelled support of government. Clearly, a local school board does not need to demonstrate a compelling state interest every time it spends a taxpayer's money in ways the taxpayer finds abhorrent. But the reason for permitting the government to compel the payment of taxes and to spend money on controversial projects is that the government is representative of the people. The same cannot be said of a union, which is representative only of one segment of the population, with certain common interests. The withholding of financial support is fully protected as speech in this context.

*Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 259 n. 13, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (Powell, J., concurring). In *Keller v. State Bar of California*, 496 U.S. 1, 11–13, 110 S.Ct. 2228, 2234–35, 110 L.Ed.2d 1 (1990), the Supreme Court expanded Justice Powell's reasoning. *Keller* rejected California's assertion that the State Bar was a government entity whose activities were protected by the government speech doctrine based on three distinctions between the State Bar and other governmental entities: (1) the principal funding for its activities came from dues levied on its members; (2) its membership was restricted to lawyers admitted to practice in the state, who were required to join; and (3) while it performed important tasks to regulate the profession, its services in that regard were advisory in nature because the actual enforcement was reserved to the State Supreme Court. *Id.* Applying

those factors here, the Court concludes that the Commission is not a government entity. Like the State Bar, the Commission's funding comes exclusively from its assessments levied against those eligible to participate in its activities. RCW 15.24.100. Similar to the State Bar, only apple growers, producers and dealers may be members of the Commission. RCW 15.24.020. *Keller* found relevant that the members and officers of the state bar are "not such because they are citizens or voters, but because they are lawyers." 496 U.S. at 13, 110 S.Ct. at 2235. Similarly, the Commission assesses people and organizations, and those people are eligible for election to the Commission not because they are residents of a particular area, like a school board, or Washington State citizens or voters, but because they are growers and producers of apples. Finally, while the Commission is nominally granted the power to enforce and prosecute violations of its chapter, RCW 15.24.070, county and state law enforcement officers are charged with enforcement, RCW 15.24.180, while the state superior courts are vested with jurisdiction to prevent and restrain violations. RCW 15.24.210. Thus, like the State Bar, actual enforcement is reserved to the state courts, not the Commission. Because the Commission is representative of only one special group in Washington, apple growers and producers, from whom its funding comes, and to whom the benefits of its activities flow, the Court finds that it is not a government entity.

■ The Court also rejects the possibility that the Commission is charged to speak for the Washington State government. The Supreme Court has recognized that where:

> the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Gov-

ernment for purposes of the First Amendment.

*Lebron v. National R.R. Corp.,* 513 U.S. 374, 400, 115 S.Ct. 961, 974–75, 130 L.Ed.2d 902 (1995). Speech is government speech only when the government is responsible for it. When the government elects to fund a private speaker, it is only be responsible for that speech when it dictates the message to be conveyed *and* retains control over the speech. In *Downs v. Los Angeles Unified School Dist.,* 228 F.3d 1003 (9th Cir.2000), the court focused on who was actually responsible for the speech. *Id.* at 1011. There, the court found that the content of bulletin boards in schools relating to Gay and Lesbian Awareness Month was government speech because the school district and school board were responsible for 1) the recognition of Gay and Lesbian Awareness month and 2) the content of the bulletin boards, through the principals' oversight, even if materials did not need pre-approval before posting. *Id.* at 1006. Here, the opposite is true because there is no oversight here as neither the State of Washington, nor any of its political subdivisions, retain authority to edit, change, or censor the Commission's speech.

Additionally, while the Director of the Washington Department of Agriculture is an *ex officio* member of the Commission, he is a non-voting member, with no authority over advertisements and no power to veto Commission decisions. By contrast, the United States Secretary of Agriculture

("Secretary of Agriculture") has final authority over all the activities of the Cattlemen's Beef Promotion and Research Board, a comparable body to the Commission, and actually appoints its members. *See* 7 U.S.C. § 2904(1) (giving the Secretary of Agriculture the power to appoint the members of the Beef Board);7 U.S.C. § 2904(4)(C) (requiring approval of all budgets, plans and projects, including advertising, by the Secretary of Agriculture); 7 U.S.C. § 2904(6)(A) & (B) (requiring approval of contracts to implement plans of the Beef Board by the Secretary of Agriculture). Because the Secretary of Agriculture retains final approval authority for projects, such as advertising, of the Beef Board and appoints the members of the Board, while the Washington Director of the Department of Agriculture does not, the cases analyzing whether the speech, including advertising, created by the Beef Board using mandatory assessments, is government speech, *see e.g. Charter v. United States Dept. of Agric.,* CV–00–198–BLG–RFC (D.Mon.2002), are inapposite.[4] Neither the State of Washington, nor any of its political subdivisions retain the authority to appoint members of the Commission, RCW 15.24.020–050, rendering *Lebron* inapplicable. As neither the State of Washington, nor any of its political subdivisions, retains control over the Commission's speech, the government is not responsible for the speech. For that reason, the Commission's speech is not government speech.[5]

---

4. Because the Washington State Director of the Department of Agriculture has no actual power to affect the Commission's decisions, the Court need not pass on the argument made in *U.S. v. Frame,* 885 F.2d 1119 (3rd Cir.1989), that a nominal power to appoint and approve activities did not create government speech because the Secretary merely rubber stamped the decisions of the relevant industry.

5. The Court also rejects the Commission's argument that if student led prayer before a high school football game is attributable to the government, *Santa Fe Indep. School Dist. v. Doe,* 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), so too must be the Commission's speech. *Santa Fe* is an establishment clause case, which turns on whether there is perceived or actual endorsement of the private speech by the government. *See id* at 305, 120 S.Ct. at 2277. Aside from the dearth of authority applying the Establish-

## C. Glickman & United Foods

■ As discussed above, in *Glickman*, the Court articulated the test for the constitutionality of mandatory assessments funding agricultural marketing to be that such assessments imposed under collective program created by a valid compelled association may sometimes be used to pay for speech over the objection of some members, they could not be used to fund speech activities not germane to the purpose for which the compelled association is justified. *Id.* at 473, 117 S.Ct. 2130. The Court applied that test, finding it "clearly satisfied in this case because (1) the generic advertising of California peaches and nectarines is unquestionably germane to the purposes of the marketing orders and, (2) in any event, the assessments are not used to fund ideological activities." *Id.* The Court thus found that the constitutional test applicable to such programs is not based on the more stringent First Amendment doctrines, because the mandatory assessments are "a species of economic regulation that should enjoy the same strong presumption of validity that we accord to other policy judgments made by Congress." *Id.* at 477, 117 S.Ct. at 2142. *Glickman* thus established that, at least in that factual setting, the assessments were not speech restrictions, but were, instead, economic regulations.

In *United Foods*, the Court limited its holding in *Glickman* to those cases where the assessments were best viewed as economic regulation and not compelled speech. "In *Glickman*, the mandated assessments for speech were ancillary to a more comprehensive program restricting marketing autonomy. Here, for all practical purposes, the advertising itself, far from being ancillary, is the principal object of the regulatory scheme." *United States v. United Foods, Inc.*, 533 U.S. 405, 121 S.Ct. 2334, 2338–39, 150 L.Ed.2d 438 (2001). The Court went on to distinguish *Glickman:*

> In *Glickman* we stressed from the very outset that the entire regulatory program must be considered in resolving the case. In deciding that case we emphasized "the importance of the statutory context in which it arises." The California tree fruits were marketed "pursuant to detailed marketing orders that ha[d] displaced many aspects of independent business activity." Indeed, the marketing orders "displaced competition" to such an extent that they were "expressly exempted from the antitrust laws." The market for the tree fruit regulated by the program was characterized by "[c]ollective action, rather than the aggregate consequences of independent competitive choices." The producers of tree fruit who were compelled to contribute funds for use in cooperative advertising "d[id] so as a part of a broader collective enterprise in which their freedom to act independently [wa]s already constrained by the regulatory scheme." The opinion and the analysis of the Court proceeded upon the premise that the producers were bound together and required by the statute to market their products according to cooperative rules. To that extent, their mandated participation in an advertising program with a particular message was the logical concomitant of a valid scheme of economic regulation.

ment Clause test for government speech to a free speech case, *Santa Fe*, noted, as part of the indicia suggesting actual or perceived endorsement by the school district, that the public address system over which the invocation was delivered remained in the actual control of school officials. *Id.* at 307–08, 120 S.Ct. at 2278. As the State of Washington does not retain analogous control over the Commission, *Santa Fe* is inapposite.

Id. at 412, 121 S.Ct. at 2339 (internal citations omitted). By contrast, in the *United Foods* case, the Court found that:

Beyond the collection and disbursement of advertising funds, there are no marketing orders that regulate how mushrooms may be produced and sold, no exemption from the antitrust laws, and nothing preventing individual producers from making their own marketing decisions. As the Court of Appeals recognized, there is no "heavy regulation through marketing orders" in the mushroom market. Mushroom producers are not forced to associate as a group which makes cooperative decisions. "[T]he mushroom growing business ... is unregulated, except for the enforcement of a regional mushroom advertising program," and "the mushroom market has not been collectivized, exempted from antitrust laws, subjected to a uniform price, or otherwise subsidized through price supports or restrictions on supply."

*Id.* at 412–13, 121 S.Ct. at 2339(citations omitted). Finding *Glickman* distinguishable, the *United Foods* Court found:

We have not upheld compelled subsidies for speech in the context of a program where the principal object is speech itself. Although greater regulation of the mushroom market might have been implemented under the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, 7 U.S.C. § 601 *et seq.*, the compelled contributions for advertising are not part of some broader regulatory scheme. The only program the Government contends the compelled contributions serve is the very advertising scheme in question. Were it sufficient to say speech is germane to itself, the limits observed in *Abood* and *Keller* would be empty of meaning and significance. The cooperative marketing structure relied upon by a majority of the Court in *Glickman* to sustain an

ancillary assessment finds no corollary here; the expression respondent is required to support is not germane to a purpose related to an association independent from the speech itself; and the rationale of *Abood* extends to the party who objects to the compelled support for this speech.

*Id.* at 415–16, 121 S.Ct. at 2340–41.

The principal support for the Commission's argument that, as was the case in *Glickman* and unlike *United Foods,* its assessments exist as part of a broader, comprehensive regulatory scheme is the legislation creating and regulating the Commission. The Washington State Legislature amended the statutes governing the Commission in 2002, and included language that:

The history, economy, culture, and future of Washington state's agricultural industry involves the apple industry. In order to develop and promote apples and apple products as part of an existing comprehensive scheme to regulate those products, the legislature declares:

. . . . .

(d) That the apple industry is a highly regulated industry and that this chapter and the rules adopted under it are only one aspect of the regulation of the industry. Other regulations and restraints applicable to the apple industry include:

(i) Washington agriculture general provisions, chapter 15.04 RCW;

(ii) Pests and diseases, chapter 15.08 RCW;

(iii) *Standards of grades and packs,* chapter 15.17 RCW;

(iv) Tree fruit research, chapter 15.26 RCW;

(v) Controlled atmosphere storage, chapter 15.30 RCW;

(vi) Higher education in agriculture, chapter 28.30 [28B.30] RCW;

(vii) Department of agriculture, chapter 43.23 RCW;

(viii) Fertilizers, minerals, and limes under chapter 15.54 RCW;

(ix) Organic food products act under chapter 15.86 RCW;

(x) Intrastate commerce in food, drugs, and cosmetics under chapter 69.04 RCW and rules;

(xi) Horticultural plants and facilities—inspection and licensing under chapter 15.13 RCW;

(xii) Planting stock under chapter 15.14 RCW;

(xiii) Washington pesticide control act under chapter 15.58 RCW;

(xiv) Farm marketing under chapter 15.64 RCW;

(xv) Insect pests and plant diseases under chapter 17.24 RCW;

(xvi) Weights and measures under chapter 19.94 RCW;

(xvii) Agricultural products—commission merchants, dealers, brokers, buyers, and agents under chapter 20.01 RCW; and

(xviii) The federal insecticide, fungicide, and rodenticide act under 7 U.S.C. § 136; ....

RCW 15.24.900(2).[6] The Commission has also marshaled the opinions of two experts, Jim Jesernig, a former Washington State representative and senator as well as the former Washington State Director of Agriculture, (Ct.Rec.118); and Jonathan W. Field, the CEO of the California Tree Fruit Agreement at issue in *Glickman*, (Ct.Rec.119), both of whom opine that, the extensive network of federal and state regulatory schemes applicable to the Washington apple industry render it a comprehensively regulated industry, similar to that in *Glickman*.

While the Washington legislature, and the Commission's experts have articulated a wide array of other regulations to which the Washington apple industry is subject, the Court reads *Glickman* and *United Foods* to hold that only a comprehensive economic-based regulatory scheme, which restricts the freedom of its members to market their products, effectively collectivizing the industry, can fit within the *Glickman* ruling. *Delano Farms v. California Table Grape Comm'n*, 318 F.3d 895 (9th Cir.2003), found the California Table Grape Commission's assessments violated the First Amendment, in light of *United Foods*.[7] The opinion specifically rejected the Table Grape Commission's contention that regulatory schemes, similar to those related to the Commission here, classified it as a *Glickman* case:

> The Table Grape Commission argues that grapes are regulated by various California statutes addressing such matters as testing, equipment and standards for fruit maturity, container standards, federal regulation of grading standards (e.g., what does "extra fancy" mean?),

**6.** The Commission asserts that this Court should defer to the Washington State Legislature's factual finding of comprehensive regulation. While the Court agrees that the Washington State Legislature's factual findings regarding the Commission are entitled to deference, that deference cannot preclude this Court's independent judgment of the facts necessary to decide the constitutionality of the Commission's assessment structure. *See e.g. Sable Communications of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 129, 109 S.Ct. 2829, 2838 106 L.Ed.2d 93 (1989) (holding that legislative findings are due deference, that cannot foreclose a court's constitutional analysis); *see also Moser v. F.C.C.*, 46 F.3d 970, 974 (9th Cir.1995) (holding that deference to legislative fact finding does not "foreclose the court's independent judgment of the facts bearing on an issue of constitutional law").

**7.** *Delano Farms* only dealt with the *United Foods/Glickman* issue. It did not address the commercial speech or government speech issues also before the Court here.

and quality standards for exported grapes. There is a "marketing order" of the collective sort in one location, though not applicable to the issue in the case at bar. Such consumer protection, and information regulations apply to much of the economy, and are far from rising to the level of collectivization that controlled the result in *Glickman.*

*Id.* at 899. Based on *Delano Farms,* the Court concludes that the health, safety and consumer protection regulations identified by the Commission do not render this a comprehensive regulatory scheme. The Court also rejects the Commission's argument that restrictions on foreign export of Washington Apples, which may affect the price charged in foreign markets, can render a market comprehensively regulated. Most, if not all good produced in the United States are subject to similar foreign trade restrictions. Were the Commission correct, virtually every market would be comprehensively regulated and *Glickman,* rather than *United Foods* would be the rule as opposed to the exception.

Further, *United Foods* cited four aspects of the mushroom market that distinguished it from *Glickman*'s comprehensive regulatory scheme: "the mushroom market has not been collectivized, exempted from antitrust laws, subjected to a uniform price, or otherwise subsidized through price supports or restrictions on supply." 121 S.Ct. at 2339. The deposition testimony of the President of the Commission, Welcome Sauer, which is uncontested on these points, establishes that the Washington apple industry is not subject to marketing orders, by the Commission or any other body, (Ct. Rec. 219 Decl. of Eric Wahlquist, Ex. A, Depo. of Welcome Sauer at 83:22–84:12), producers make their own marketing decisions, (*id.* at 84:13–15); no mandatory organization sets the price for Washington apples, (*id.* at 86:19–88:16), there are no quantity controls, quotas or market allocations, (*id.* at

82:1–8; 90:4–12). Mr. Sauer testified that, in his opinion, the apple industry has been "very well collectivized in its marketing, in its advertising, and in which products it can take to market in terms of grades and standards." (*Id.* at 87:17–21.) While that might be true, "collectivization of the market" does not refer to the cooperative advertising done by the Commission, but to the removal of independent business activity and choices by the producers. *See United Foods,* 533 U.S. at 412, 121 S.Ct. at 2339. While the activities of the Commission are exempt from the antitrust laws, RCW 15.24.160 (2002), the Court finds that was an effort to add a *Glickman* factor with no real basis in fact. The antitrust laws protect against anti-competitive conduct, whether created by agreement among competitors, *see* Sherman Act § 1, or engaged in unilaterally, *see* Sherman Act § 2. The Commission is not empowered to (1) set minimum or maximum price; (2) set minimum or maximum quantity of output; (3) set number of suppliers; (4) set minimum quality of product; (5) set other terms of sale; (6) limit entry into the market; (7) limit independent advertising by producers; or (8) limit the amount or type of information that can be disseminated. As these are the principal, although certainly not the only, means by which the antitrust laws can be violated by agreements among competitors, the Commission has not shown that its antitrust exemption serves a purpose other than to permit it to analogize its activity to *Glickman* rather than *United Foods.* Finally, Mr. Sauer asserts that Washington apple market, and more specifically the market price, is highly responsive to both supply and demand. (Ct. Rec. Ct. Decl. of Welcome Sauer Re the Apple Commission Programs ¶ 3.) This could only be true in a competitive market, because in a collectivized market, price would not respond to fluctuations in supply or demand, being fixed. Given that the

other indicators *United Foods* described do not exist here, *see United Foods*, 121 S.Ct. at 2339, the Court concludes that the Commission is not part of a comprehensive regulatory structure collectivizing the Washington apple market.

Like *United Foods*, the Apple Commission's essential purpose is the advertisements and other marketing which it produces. In the years 1998–99 through 2001–02, the Commission spent between 62.5% and 85% of its budget expenditures were spent on "marketing" activities. (Ct. Rec. 219, Decl. Of Erik K. Wahlquist Ex. G.) Those same spreadsheets reflect that while not all of that budget is allocated to "consumer advertising," the vast majority of "marketing" expenditures fits within four categories: (1) publications; (2) trade advertising; (3) consumer advertising; (4) promotions. The Court finds that these constitute "speech" for the purposes of this analysis.

### D. Central Hudson

 The Commission argues that even if its activities are not government speech immune from First Amendment scrutiny, or acceptable under *United Foods*, it may still be a permissible regulation of commercial speech. *Central Hudson* set forth the test for restrictions on commercial speech. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Commercial speech, which is "expression related solely to the economic interest of the speaker and its audience," *Central Hudson*, 447 U.S. at 562, 100 S.Ct. at 2350, receives First Amendment protection, but to a lesser degree than other forms of constitutionally protected expression. *Id.* at 562–63, 100 S.Ct. at 2349–50.

While advertising fits the classical definition of commercial speech in that it does no more than propose a commercial transaction, *Central Hudson*, 447 U.S. at 562, 100 S.Ct. at 2349, the Commission's mandatory assessments are not a restriction upon the commercial speech of the Defendants like a restriction on their ability to advertise would be. Rather, the objecting apple producers are compelled to pay for commercial speech. Although *United Foods* did not clearly reject application of the *Central Hudson* test, it did refuse to consider the first prong of that test:

> We need not enter into the controversy, for even viewing commercial speech as entitled to lesser protection, we find no basis under either *Glickman* or our other precedents to sustain the compelled assessments sought in this case.... the Government itself does not rely upon Central Hudson to challenge the Court of Appeals' decision, Reply Brief for Petitioners 9, n. 7, and we therefore do not consider whether the Government's interest could be considered substantial for purposes of the *Central Hudson* test.

*United Foods*, 121 S.Ct. at 2337–38. The Court concludes that *United Foods*, by refraining from deciding the first prong of *Central Hudson*, deemed the commercial speech test inapplicable. *Central Hudson*'s test for commercial speech does not apply to a compelled funding case, because the *Central Hudson* test, which requires that the restriction on speech not be "more extensive that necessary" to serve the interest, 447 U.S. at 566, 100 S.Ct. at 2351, presupposes a restriction on speech. Here, the Defendants' speech is not being restricted, instead it is being compelled. Because the Commission's assessments do not restrict speech, it is inappropriate to apply the *Central Hudson* test for restrictions on speech. *See also Glickman*, 521 U.S. at 474 n. 18, 117 S.Ct. at 2141 (reversing the Ninth Circuit's decision to apply *Central Hudson* ).

At argument on these motions, the Commission argued that *United Foods* cited a

compelled speech case, *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), which applied the *Central Hudson* test, undermining this Court's conclusion not to apply *Central Hudson* at all. *Zauderer* upheld the requirement that an attorney, who choose to advertise, include certain disclosures in that advertising. *Id.* at 650–52. *Zauderer* reasoned that because the government is free to regulate commercial speech to prevent it from being false, deceptive or misleading, *id.* at 638, 105 S.Ct. 2265, it can compel speech to ensure those ends as well, *id.* at 652, 105 S.Ct. 2265. Because the rationale for regulation there, to prevent false and misleading commercial speech, does not apply to the compelled funding of commercial speech here, *Zauderer* is inapplicable to this case. *See also United Foods* 533 U.S. at 416, 121 S.Ct. at 2341 (holding that *Zauderer* was inapposite because there was no suggestion that the mandatory assessments were necessary to prevent voluntary advertising from being misleading).

### E. Washington Constitution

■ The Defendants argue that, even if the Commission passes First Amendment scrutiny, its assessments fail under the Washington Constitution. The Washington Constitution uses different language from the United States Constitution: "Every person may freely speak, write and publish on all subjects being responsible for the abuse of that right." Wash. Const. Article I, Section V.[8] This provision provides no lesser, and sometimes greater, protection that the First Amendment.

O'Day v. King County, 109 Wash.2d 796, 802, 749 P.2d 142 (1988). Thus, a violation of the First Amendment is always a violation of the Washington Constitution. As the Court has found that the mandatory assessments violate the United States Constitution, the Court must conclude that the mandatory assessments also violate the Washington Constitution.[9]

### F. Scope of Declaratory Relief

The Commission argues in the alternative, that if the Court finds that the compelled assessments for speech violates the First Amendment, then the Court should determine what percentage of the Commission's expenditures are unconstitutional, and only enjoin that use, refunding that portion of past assessment, while leaving the Commission free to collect assessments and spend them for other purposes. In this respect, the Commission analogizes to *Keller* and *Abood*, which held that while members of a valid compelled association could be compelled to fund activities, including speech, germane to the purpose of that association, they could not be compelled to fund activities not germane to that purpose. It thus argues that because the Commission does have activities beyond advertising speech, it should be able to continue to engage in, and fund with the mandatory assessments, those activities.

However, The Court has determined that the Commission's principal purpose is speech. *United Foods* held that compelled subsidies were unconstitutional where their principal object is speech itself. *United Foods*, 533 U.S. at 415–16, 121

**8.** The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I.

**9.** The Interveners cite a pre-*United Foods* case, *Gerawan Farming, Inc. v. Lyons*, 24 Cal.4th 468, 101 Cal.Rptr.2d 470, 12 P.3d 720 (2000), which interpreted the free speech pro-

vision of the California Constitution, identical to that in Washington, to reach beyond the First Amendment, as interpreted by *Glickman*. *Id.* at 514, 12 P.3d at 720. They ask the Court to interpret the Washington Constitution similarly. Given the Court's rulings, discussion of this point is unnecessary.

S.Ct. at 2340–41. The distinction between this case and *Abood/Keller* is that the principal purpose of the union in *Abood,* or the State Bar in *Keller,* did not violate the First Amendment, whereas the principal purpose of the Commission here does. Because the Commission's principal purpose is speech, and its assessments are unconstitutional, the Court declines the invitation of the Commission to recreate the Commission in a constitutional form. That task is left to the Washington State legislature, where all stakeholders can engage in robust public debate, with the final decision left to those elected by the citizens of the State of Washington.

## V. Conclusion

Finding no genuine issue of material fact as to the five questions presented by the parties, the Court makes the following conclusions of law: (1) the Washington apple industry is not part of a comprehensive regulatory structure; (2) the Commission's activities are not protected by the by the government speech doctrine; (3) the *Central Hudson* test for commercial speech does not apply to this case. As a result of those findings, the Defendants are entitled to declaratory judgment that RCW 15.24.100, which permits the Commission to assess growers to fund its activities is unconstitutional, under the First Amendment to the United States Constitution, and the Washington Constitution. The Defendants are also entitled to equitable relief enjoining the Commission from collecting assessments under RCW 15.24.100. Having determined to afford the Defendants this relief, the Court has eliminated much of the need for trial in this case. However, issues, such as the propriety of refunds, and the measure of damages to each defendant class member remain. The Court therefore directs the parties to meet and confer, and then file, concurrently with the joint pretrial order on April 7, 2003, a joint submission, as set forth herein, identifying the claims or issues requir-ing decision before final judgment may be entered. Accordingly,

**IT IS HEREBY ORDERED:**

1. Plaintiff Washington State Apple Advertising Commission's Motion for Summary Judgment, (Ct.Rec.223), is **DENIED**.

2. The Defendant's Motion for Summary Judgment, (Ct.Rec.214), is **GRANTED IN PART**, as set forth herein.

3. The Organic Intervening Defendants' Motion to Join in Defendant's Motion for Summary Judgment, (Ct.Rec.238), is **GRANTED**.

4. All other pending motions, because they relate to trial on liability, *except* the Plaintiff's Motion in Limine, (Ct.Rec.260), are **DENIED AS MOOT**.

5. The parties are to meet and confer regarding the issues and claims remaining in this case after the Court's ruling above. They shall file a joint report containing, if possible, a stipulation as to the issues and claims remaining, or if not possible, each party's position on what issues and claims require decision.

**IT IS SO ORDERED.** The District Court Executive is directed to

(1) Enter this Order; and

(2) Provide copies to all counsel.