(257 P.3d 864)
No. 103,762

CITY OF OVERLAND PARK, *Appellee*, v. KELLY K. RHODES, *Appellant*.

Opinion filed July 8, 2011.

*Jeremiah Johnson*, of the Law Offices of Jeremiah Johnson, LLC, of Olathe, for appellant.

*John J. Knoll*, senior assistant city attorney, for appellant.

Before PIERRON, P.J., ATCHESON, J., and LARSON, S.J.

PIERRON, J.: Kelly K. Rhodes appeals her conviction of driving while intoxicated (DUI). She argues the police DUI checkpoint was unconstitutional and, as a result, her conviction should be reversed. She also argues the Intoxilyzer 8000 test results should have been suppressed because the officers failed to comply with the Kansas Department of Health and Environment (KDHE) regulations and the Intoxilyzer 8000 was not properly certified. We affirm.

On August 22, 2008, Overland Park Police set up a DUI checkpoint along Metcalf Avenue. Motorists were directed off Metcalf Avenue and into a parking lot where they were directed into enforcement lanes. The enforcement lane officers had been instructed to look for signs of alcohol consumption or impaired drivers. If they noticed impairment or consumption, the officers asked the driver to step out of the vehicle and undergo further testing. If an individual was asked to undergo additional testing, another officer would park the vehicle and any passengers would wait in the waiting area.

Rhodes was directed into the enforcement lane in front of Officer Christopher Moore. He smelled the odor of alcohol coming from the Rhodes vehicle and noticed that her eyes were red, watery, and bloodshot. Officer Moore told Rhodes that the operation was a DUI check point and asked her if she had been drinking that night. With slurred speech, Rhodes admitted she had been drinking. Officer Moore asked Rhodes to perform field sobriety tests. He had her perform the HGN, the walk and turn, and one-leg stand, and recite the alphabet and some numbers. Rhodes exhibited several clues of impairment. As a result, Officer Moore arrested Rhodes for DUI and escorted her to the booking area.

At 1:04 a.m., Officer Moore checked Rhodes' mouth for any foreign objects. He read her the *Miranda* rights, gave her a written copy of the DC-70, and read the implied consent advisories to her. Rhodes agreed to take a breath test. Between 1:04 a.m. and execution of the breath test, Officer Moore kept Rhodes in constant observation to make sure she did not put any foreign objects into

her mouth. Twenty minutes later, Officer Moore walked Rhodes over to a van where Deputy Hamilton performed the breath test. Rhodes blew a .115 alcohol concentration on the breath test. Rhodes was arrested and charged with DUI.

On June 18, 2008, Rhodes was found guilty of DUI in municipal court and sentenced to 180 days in jail. Her conviction was affirmed by the district court.

For her first argument on appeal, Rhodes argues the majority of the factors under *State v. Deskins*, 234 Kan. 529, 673 P.2d 1174 (1983), weigh in favor of the suppression of the evidence and, thus, because the State failed to prove the reasonableness of the checkpoint stop under the Fourth Amendment to the United States Constitution, the district court erred in failing to suppress the results of the stop.

"An appellate court reviews the district court's decision on a motion to suppress using a bifurcated standard. Without reweighing the evidence, the district court's findings are reviewed to determine whether they are supported by substantial competent evidence. The appellate court then reviews the ultimate legal conclusion regarding the suppression of evidence using a de novo standard." *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007).

The Fourth Amendment protects individuals against " ' "arbitrary invasions by government officials" by imposing a standard of reasonableness upon the exercise of those officials' discretion.' " *State v. Barker*, 252 Kan. 949, 953, 850 P.2d 885 (1993). Stopping and detaining a motorist without some " 'articulable and reasonable suspicion' " of unlawful conduct is an unreasonable seizure under the Fourth Amendment. 252 Kan. at 953. However, checkpoint cases have carved out an exception to this general rule. 252 Kan. at 953.

In order to meet this exception, these cases have set out a series of factors that must be weighed together in determining the constitutionality of a DUI checkpoint. They are as follows:

"Numerous conditions and factors must be considered in determining whether a DUI roadblock meets the balancing test in favor of the [State]. Among the factors which should be considered are: (1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice

to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test. Not all of the factors need to be favorable to the State but all which are applicable to a given roadblock should be considered." *Deskins*, 234 Kan. at 541.

Thus, the court must weigh each of these factors, recognizing that "[n]ot all of the factors must be favorable to the State." *Barker*, 252 Kan. at 953. Following is an analysis of each of the *Deskins* factors in the context of the present case:

### The Degree of Discretion, If Any, Left to the Officer in the Field

The kind of standardless and unconstrained discretion that results from an officer's ability to stop any vehicle out of whim " 'is the evil the Court has discerned when . . . it has insisted that the discretion of the official in the field be circumscribed, at least to some extent.' " *Deskins*, 234 Kan. at 535. " 'To that end, the Fourth Amendment requires . . . that [a] seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.' " 234 Kan. at 536. As part of this plan, " ' "questioning all oncoming traffic at roadblock type stops is one possible alternative." ' " 234 Kan. at 539.

In this case, the officers had no discretion regarding which cars to stop, they were to stop all vehicles. The officers in charge set up strict standards for the officers to follow and provided a briefing on these standards to each officer before they went on duty at the checkpoint. The officers were even given standard greetings to give to each driver and told to hand drivers a brochure and inquire whether the driver had anything to drink that evening. From the facts, there was little, if any, degree of discretion left to the officers performing the DUI checkpoint.

### The Location Designated for the Checkpoint

Rhodes introduces persuasive authority that "statistics concerning the extent of the problem of drunk driving" should be pre-

sented. This does not necessarily make the checkpoint unreasonable however. The location chosen by the officers was because of the high DUI and alcohol incidents in the area and because a severe fatality had recently occurred nearby. In support of this reasoning, the State produced evidence of the area being a "high accident" area. Although no specific "statistics" were presented, in an area that is already a high accident area, it would be reasonable for the officers to set up a DUI checkpoint to lessen the further possibility of more accidents being caused by the accident-prone drunk driver.

*The Time and Duration of the Checkpoint*

Several cases have considered DUI checkpoints that started late at night, typically between 10 p.m. and 2 a.m. In each of these cases, the checkpoint was held to be constitutional. See, *e.g., Davis v. Kansas Dept. of Revenue*, 252 Kan. 224, Syl. ¶ 1, 843 P.2d 260 (1992); *Deskins*, 234 Kan. at 531, 542-43. Similarly, the DUI checkpoint in this case was operated from 11 p.m. to 2 a.m.

*Standards Set by Superior Officers*

In *Barker*, 252 Kan. at 956, the court concluded that briefing the officers prior to operating the checkpoint was sufficient to meet this standard. In its reasoning, this briefing period, performed by an officer's superiors, was sufficient to instruct officers on the expectations and procedures for the checkpoint. 252 Kan. at 956. Here, Officer Koos, the officer in charge of the checkpoint, provided two briefing sessions: one for the set-up staff and one for officers arriving later. This process was to assure that all officers attended at least one briefing. In preparation for the briefings, Officer Koos put together handouts and a PowerPoint presentation. Clearly, the officers had uniform operating standards established by their superior officers.

*Advance Notice to the Public at Large*

In both *Barker* and *State v. Jackson*, 24 Kan. App. 2d 38, 40, 942 P.2d 640, *rev. denied* 262 Kan. 965 (1997), the court was not concerned about the absence of advance warning to the public. The *Barker* court held that although desirable, "its absence does

not by itself vitiate the checklane." 252 Kan. at 956. On July 31, 2008, Officer Koos received a forwarded email regarding the DUI checkpoint that was addressed to several different media outlets. Although there was no evidence that the checkpoint was advertised through these media outlets, this is not enough to "vitiate the checklane." See *Barker*, 252 Kan. at 956.

*Advance Warning to the Motorist Approaching the Checkpoint*

The *Barker* court recognized that warning signs posted approximately 500 feet before cars entered the checkpoint lane was adequate advance notice. 252 Kan. at 956. Here, not only did the officers place a "DUI Checklane Ahead" sign 500 feet before entering the checkpoint, they also had "Be prepared to Stop" signs posted before that. According to *Barker*, these measures were sufficient to give advance warning to individual approaching motorists.

*Maintenance of Safety Conditions*

Officer Koos testified she took the officers' safety into consideration in planning for the checkpoint. She made sure the area was well lit, level, and adequate advance notice had been posted so the vehicles would not be dangerous to the officers. She also made sure the officers wore appropriate traffic vests and carried flashlights. Officers set up cones directing traffic. Officers were placed at each turn to direct the cars through the cones into the enforcement lanes. Through traffic signage, the officers tried to control the traffic flow to prevent cars from running into each other. The parking lot, where the actual checkpoint was set up, was deemed safer than the roadway. Just as in *Barker*, "great pains were taken by the State to insure the safety of all travelers, as well as the officers in the operation." 252 Kan. at 956.

*Degree of Fear or Anxiety Generated by the Mode of Operation*

"The anxiety factor in *Deskins* does not speak in terms of hypothetical anxiety. The *Deskins* factor is phrased 'fear and anxiety generated.' " *State v. MacDonald*, 253 Kan. 320, 323, 856 P.2d 116 (1993). The record is silent regarding actual fear or anxiety generated by the checkpoint. But it can be assumed that "other vehicles [were] being stopped, [so they could] see visible signs of the

officers' authority, and [would be] much less likely to be frightened
. . . ." ' " *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 453,
110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990). Thus, without affir-
mative evidence in the record, the presumption is that any concern
or anxiety that may have existed dissipated when a motorist saw
the traffic signs, police officers, and other traffic control devices.

*Average Length of Time Each Motorist is Detained*

"The essence of the Fourth Amendment prohibition is to safe-
guard the privacy and security of individuals against arbitrary in-
vasions by governmental officials by imposing a standard of rea-
sonableness upon the exercise of those officials' discretion."
*Deskins*, 234 Kan. at 540. Thus, in balancing governmental inter-
ests against the resulting intrusion on the individual, reasonable-
ness is the key. See 234 Kan. at 540-41.

In *Sitz*, the United States Supreme Court found that a 25-second
delay for each vehicle was not sufficient to violate constitutional
standards. Likewise, in *Davis* the delay time was roughly 31 sec-
onds, and in *Barker* the delay amounted to about 45 seconds. In
each of these cases, the court found that the delay to the motorist
was constitutionally permissible and reasonable. Specifically, the
*Barker* court took into account the purpose for which detainment
occurred and recognized that in some situations a longer detain-
ment would be necessary. 252 Kan. at 957. The court concluded
that, overall, the "officers complied with their initial plan of de-
taining motorists momentarily." 252 Kan. at 957. Even though the
delay was longer in this case, it does not amount to being unrea-
sonable.

During the operation of the 4-hour checkpoint in this case, 601
vehicles went through. The police department reported that the
average length of the stop was 147 seconds. The officers deter-
mined this average by randomly timing 14 vehicles as they made
their way through the checkpoint. Not only were the officers check-
ing for intoxicated drivers, they were also distributing brochures
about the purpose of the checkpoint, the effects of DUIs, and
trying to educate the public as a whole. In balancing the govern-
ment's interest with the intrusion on an individual, it would appear,

taken in its totality, the 147-second detainment was a reasonable amount of time to carry out the checkpoint's purposes.

*Physical Factors Surrounding the Location, Type, and Method of Operation*

The *Deskins* court looked to the fact that there were 35 to 40 officers involved in the checkpoint, it was set up in a well-lit area, there were red flashing lights, officers were uniformed, and the location was chosen by supervisory personnel. As in *Deskins*, the police department here performed briefings, set out cones with officers directing traffic into the enforcement lane, the area was well lit, and the officers had flashlights and wore appropriate traffic vests. Furthermore, supervisors—not the officers in the field—chose the area to locate the checkpoint.

Rhodes argues that the checkpoint in question had no permanency and, therefore, does not meet this factor. This misinterprets *Deskins*. The *Deskins* court ruled the checkpoint constitutional without taking into account the permanency of the location. See 234 Kan. at 546 (Prager, J., dissenting). We agree with *Deskins* that the permanency of the location is not the appropriate consideration for this factor.

*The Availability of Less Intrusive Methods for Combating the Problem*

It would appear this factor is wrapped up with the effectiveness factor as we look to whether the goal of the checkpoint was accomplished and effective. See *Barker*, 252 Kan. at 957. Rhodes argues there were other less intrusive ways to prevent DUIs. like putting the officers at the exit of a bar to explain the consequences of DUI or to advertise through the radio. Similarly, Officer Koos admits there were less intrusive alternatives. In support of Rhodes' argument, she introduces persuasive authority noting that "[n]othing in the record indicates that the only practical or effective means of apprehending drunk drivers" is through a DUI checkpoint. Officer Koos testified that if education was the only purpose of the checkpoint, advertising on the radio or television would be less intrusive.

However, in considering less intrusive methods, not every conceivable alternative to DUI prevention must be considered. If that were the case, a DUI checkpoint would never be permissible because there would always be a less intrusive way to prevent drunk driving—increase the penalty. Rather, a court looks to see if the goals of the checkpoint were accomplished and effective. See *Barker*, 252 Kan. at 957. The State recognized the checkpoint could have been done better and the results were probably not worth it. Even with this recognition however, the checkpoint is not unconstitutional. The checkpoint was still extremely effective in educating the public and, arguably, in getting drunk drivers off the road.

### The Degree of Effectiveness of the Procedure

In *Deskins*, 2,000 to 3,000 cars were stopped and only 15 persons arrested for DUI. In *Davis*, 255 motorists were stopped and 7 DUI arrests were made. And in *Sitz*, 126 vehicles passed through the checkpoint and only 2 drivers were arrested for DUI. From these cases, it is clear that effectiveness is not measured solely as a percentage of cars stopped to arrests made. Rather, it must be judged in accordance with the original goal. Here, 601 vehicles passed through the checkpoint and 10 DUI arrests were made. Following precedent, it would appear that a 1.6% arrest rate is more than sufficient for the effectiveness factor. Additionally, 601 drivers were educated on the effects of DUIs, an impact with 100% effectiveness. That achieved one of the police department's purposes.

### Any Other Relevant Circumstances Which Might Bear Upon the Test

All relevant circumstances have been considered above, and Rhodes does not present any other factor that should be weighed in the analysis.

In balancing the *Deskins* factors together to weigh the State's interest in operating the checkpoint with the intrusion on the individual, we conclude the police department appropriately considered and carried out the majority of the *Deskins* factors in the

operation of its DUI checkpoint on August 22, 2008. It was, therefore, constitutional, and the district court did not err in failing to suppress the results of the stop.

For her second argument on appeal, Rhodes argues the district court erred in
denying her motion to suppress the Intoxilyzer 8000 test results. She asserts the court erred because the "City failed to establish that the police 'substantially complied' with KDHE protocol." We disagree.

"[T]his court reviews the factual underpinning of a district court's decision for substantial competent evidence and the ultimate legal conclusion drawn from those facts de novo. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review. [Citation omitted.]" *State v. Moore*, 283 Kan. 344, 349, 154 P.3d 1 (2007).

Rhodes also argues there was an inadequate evidentiary foundation for the Intoxilyzer test results. We review this question as a question of fact, and "it is reviewed for substantial competent evidence supporting the district court's finding." *State v. Rivera*, 42 Kan. App. 2d 914, 922, 218 P.3d 457 (2009), *rev. denied* 290 Kan. 1102 (2010). "So long as there is substantial competent evidence to support the finding, it will not be disturbed on appeal." *State v. Lieurance*, 14 Kan. App. 2d 87, 91, 782 P.2d 1246 (1989), *rev. denied* 246 Kan. 769 (1990).

In order for the State to introduce the results of a breath test, it "must lay a foundation showing that the testing machine was operated according to the manufacturer's operational manual and any regulations by [KDHE]." *Lieurance*, 14 Kan. App. 2d at 91. In *Mitchell v. Kansas Dept. of Revenue*, 41 Kan. App. 2d 114, 123, 200 P.3d 496, *rev. denied* 289 Kan. 1279 (2009), the court stated: "If affirmative evidence that a breath[-alcohol test] sample was *not* contaminated is presented . . . , this is a factor the court may consider in deciding whether substantial compliance with the [breath testing] protocol has been satisfied."

Here, Detective Moore testified he was so close to Rhodes he would have noticed if she had vomited, belched, or regurgitated during the 20-minute deprivation period. He did not hear or see

any burp or regurgitation. This is affirmative evidence that the breath test was not contaminated and, therefore, Detective Moore substantially complied with the KDHE breath-testing protocol.

The State also must present evidence that the testing equipment was certified by the KDHE. See *Lieurance*, 14 Kan. App. 2d at 91-93. Here, the evidence clearly showed the instrument and operator were certified. Rhodes is not contending there was a certificate in place for the testing equipment. Instead, she argues the "Johnson County Sheriff's Office did not have a certificate for breath-testing issued by the [KDHE] that evidenced the machine was certified pursuant to the administrative regulations in place on and after March 14, 2008."

This issue has recently been resolved by the Kansas Supreme Court in *State v. Ernesti*, 291 Kan. 54, Syl. ¶ 7, 239 P.3d 40 (2010). The *Ernesti* court was faced with a similar situation involving an Intoxilyzer 8000. The court recounted a brief history of the statutory evolution because, as here, the issue centered on the validity of the certification for an Intoxilyzer that was issued before the statutory changes occurred, and the testing was completed before, under the new statutory regime, recertification occurred. See 291 Kan. at 57-58. The court rejected Ernesti's argument that the breath test results should be suppressed because the certificate had not been certified under the new regulations. See 291 Kan. at 64-69. In the end, the *Ernesti* court concluded: "There is no requirement . . . that the testing device be certified under regulations in effect on the date of testing; rather, the device must simply be certified." 291 Kan. at 70. We are bound to follow precedent, and thus, we conclude that because the testing equipment was certified, although not under the new regulations at the time of testing Rhodes, it still substantially complied with KDHE regulations.

Affirmed.

* * *

ATCHESON, J., dissenting: I respectfully dissent. Based on the City of Overland Park's representation that its primary purpose for conducting the motor vehicle checkpoint entailed publicizing par-

ticular opinions and views about driving and alcohol use, I would find the exercise violated the First and Fourth Amendment rights of Defendant Kelly Rhodes and the 600 other drivers who were waylaid. A state or local government cannot use its police powers to create captive audiences as a means of educating or advocating on particular subjects or issues no matter how popular or benign the message. The implications of a contrary rule would be both stunning and disturbing. Accordingly, the trial court should have granted the motion to suppress.

## The Facts

In this case, the Overland Park police officer coordinating the checkpoint testified at the suppression hearing that the principal reason for stopping motorists was to inform them about drinking and driving. She described the goal as an "educational" one rather than "actual enforcement" of driving under the influence laws. The officer told the district court, "The check lane is about educating the public as a whole as far as the effects of alcohol on their driving." A secondary purpose was to detect and arrest drunk drivers. In its brief to this court, the City does not dispute that description of the objectives sought to be accomplished and states by way of justifying the operation: "The educational impact of a checkpoint is difficult to measure, but real nonetheless."

The police department conducted the checkpoint from 11 p.m. on August 22, 2008, until 2 a.m. the next morning on Metcalf Avenue, a major north-south thoroughfare in the City. Motorists were required to turn off the street and into a parking lot where officers "greeted" them, explained what was going on, looked for signs of alcohol use or impaired driving, and handed out brochures about the risks of drinking and driving. The officers' greeting and following discussion with the motorists is not detailed in the motion to suppress. The participating officers apparently were given a general format to follow, but each officer could tailor the delivery to suit his or her own approach. The brochure given to every driver principally discusses the penalties for DUI and for furnishing alcohol to persons less than 21 years old. If a motorist were not detained for additional questioning or investigation as a suspected drunk

driver, the City estimated he or she would have been detained for about 2½ minutes.

The City posted a sign or signs informing approaching drivers of the checkpoint. But the signage was set up past the last place a driver could turn off Metcalf Avenue before reaching the checkpoint. In other words, every driver and his or her passengers were diverted from their travels and delayed in the parking lot. In all, the police stopped 601 vehicles, yielding 10 DUI arrests.

## STANDARD OF REVIEW AND CONSTITUTIONAL PROTECTIONS IMPLICATED

Because I apply undisputed facts as to the purpose of the checkpoint and otherwise accept the factual findings of the trial court that Rhodes displayed visible signs of alcohol consumption that would have justified investigation and then arrest had she been stopped in a constitutionally acceptable manner in the first instance, my analysis addresses legal issues. Appellate consideration of legal questions or conclusions is plenary. *State v. Fitzgerald*, 286 Kan. 1124, 1126, 192 P.3d 171 (2008) (motion to suppress); *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 916, 157 P.3d 1109 (2007).

The Fourth Amendment to the United States Constitution prohibits the government from engaging in "unreasonable searches and seizures." The First Amendment to the United States Constitution prohibits government action "abridging the freedom of speech." Both of those protections against government interference with individual freedoms have been incorporated through the Due Process Clause of the Fourteenth Amendment to the United States Constitution and, therefore, limit the actions of states and municipalities. *Mills v. Alabama*, 384 U.S. 214, 218, 86 S. Ct. 1434, 16 L. Ed. 2d 484 (1966) (noting application of Free Speech Clause to state and local governments); *Mapp v. Ohio*, 367 U.S. 643, 655, 657-58, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) (acknowledging incorporation of the Fourth Amendment prohibitions on unreasonable searches and seizures through the Fourteenth Amendment and applying the exclusionary rule to state court proceedings). The combination of free speech rights and freedom from unreasonable

seizure at play in this case appears to be a rarity. Nonetheless, a number of settled legal principles guide the analysis of that interplay. They compel the conclusion that the checkpoint impermissibly compromised the constitutional rights of all who were detained.

MOTOR VEHICLE CHECKPOINTS AND THE FOURTH AMENDMENT

When law enforcement officers stop vehicles at a checkpoint, they seize the occupants within the meaning of the Fourth Amendment. *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 450, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990); *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979) ("[S]topping an automobile and detaining its occupants constitutes a 'seizure' under the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.' "). Typically, to be constitutionally reasonable, a seizure must be justified by some particularized law enforcement suspicion that the person detained has committed, is committing, or is about to commit a crime. *Indianapolis v. Edmond*, 531 U.S. 32, 37, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000); see *Prouse*, 440 U.S. at 663. The courts, however, have found that checkpoints established for the purpose of detecting and arresting drunk drivers are constitutionally permissible without that sort of individualized cause so long as certain countervailing protections have been put in place to assure reasonableness and to prevent arbitrariness. *Edmond*, 531 U.S. at 39 ("The *Sitz* checkpoint involved brief, suspicionless stops of motorists so that police officers could detect signs of intoxication and remove impaired drivers from the road."); *Sitz*, 496 U.S. at 447.

If a government seizure causes only a minimal intrusion—something less than an arrest—the court may balance the "gravity of the public concerns" prompting the detention, the degree to which the detention advances the "public interest," and "the severity of the interference with individual liberty" to determine its constitutional propriety. *Brown v. Texas*, 443 U.S. 47, 50-51, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979); *cf. Terry v. Ohio*, 392 U.S. 1, 22-24, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (The Court considers the government interests at stake and the nature and the quality of the

intrusion on individual rights in determining the constitutionality of a seizure falling short of an actual arrest.). In *Sitz*, the United States Supreme Court acknowledged the *Brown* balancing as guiding the Fourth Amendment analysis for a DUI checkpoint. 496 U.S. at 450, 453; see 496 U.S. at 457 (Brennan, J., dissenting). That remains the analytical test. See *United States v. William*, 603 F.3d 66, 69 (1st Cir. 2010).

But 4 years before deciding *Brown*, which is not a checkpoint case at all, the United States Supreme Court upheld the constitutionality of a permanent vehicle checkpoint the Border Patrol operated near the Mexico-California border as a means of intercepting undocumented aliens. *United States v. Martinez-Fuerte*, 428 U.S. 543, 545, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976). Citing *Terry*, the Court essentially balanced "the public interest against the Fourth Amendment interest of the individual." 428 U.S. at 555. Signs on the road announced the permanent checkpoint. At the checkpoint, all vehicles had to stop for visual inspection by Border Patrol officers. Some drivers were then subject to "secondary inspection" entailing questioning or "plain view" observation of the vehicle and its contents, usually, although not invariably, based on officer observations indicating a driver or a passenger might be an unauthorized alien. The Court upheld the checkpoint, noting the substantial public interest in stemming the influx of undocumented aliens and the comparatively minimal intrusion of the stop. 428 U.S. at 556, 559. The delay for a given motorist was brief, and the advance notice of the checkpoint combined with the requirement that all vehicles go through the initial inspection reduced any concern and even fright on the part of the individuals and the potential for arbitrary action on the part of the officers. See 428 U.S. at 558-59. Accordingly, a vehicle could be stopped under those circumstances without any need for particularized suspicion that the driver might be engaged in unlawful conduct. 428 U.S. at 562.

The *Sitz* Court also drew heavily on the reasoning of *Martinez-Fuerte*, since it involved checkpoint stops, and applied those considerations to the challenged DUI checkpoint. *Sitz*, 496 U.S. at 451, 453. The Border Patrol's procedures approved in *Martinez-Fuerte* thus provided a template for evaluating the constitutionality

of DUI checkpoints. Noting disagreement among "experts in police science" as to the preferred "method[] of apprehending drunk drivers," the *Sitz* decision recognized that DUI checkpoints would satisfy Fourth Amendment requirements if certain standards were applied. 496 U.S. at 453-54.

In *Sitz*, the United States Supreme Court suggested a constitutionally acceptable checkpoint protocol needed to include steps aimed at reducing driver fear or anxiety over the seizure as compared to a typical traffic stop in which an officer uses emergency equipment to pull over a motorist suspected of a violation. 496 U.S. at 452-53. The Court pointed out that checkpoints by their very nature tend to be less stressful to detainees than individual traffic stops if for no other reason than seeing others in a like predicament. Posting signs announcing the checkpoint helps meet that concern. Likewise, the Court noted that under the checkpoint procedure challenged in *Sitz* every motorist was stopped, thereby eliminating concerns over arbitrary detentions based on officers' exercise of "unconstrained discretion" that rendered random, suspicionless car stops unconstitutional in *Prouse*. *Sitz*, 496 U.S. at 453-54. The Court also found that a DUI checkpoint would not violate the Fourth Amendment simply because it yielded what might seem to be a comparatively low number of arrests measured against the number of motorists stopped. See 496 U.S. at 448, 454-55 (1.6 percent of the drivers passing through checkpoint arrested for driving under the influence; driver not detained for further investigation passed through the checkpoint in about 25 seconds).

Looking at considerations raised in *Prouse* and *Martinez-Fuerte*, the Kansas Supreme Court has established a multifactored standard for determining the constitutionality of a DUI checkpoint under the Fourth Amendment. *State v. Deskins*, 234 Kan. 529, Syl. ¶ 9, 673 P.2d 1174 (1983); see *State v. Barker*, 252 Kan. 949, 953-57, 850 P.2d 885 (1993) (recognizing and applying *Deskins* factors). The majority opinion here outlines those factors and makes a detailed application of them. In this case, the checkpoint seems to have conformed to the standard set out in *Deskins*. But that conclusion pretermits a more fundamental constitutional inquiry based on the purpose of the checkpoint.

Following its decisions in *Sitz*, the United States Supreme Court held that law enforcement agents could not constitutionally establish checkpoints for the purpose of general crime detection or the interdiction of illegal drugs. *Edmond*, 531 U.S. at 41-42. ("Because the primary purpose of the Indianapolis narcotics checkpoint program is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment.").The checkpoints at issue in *Edmond* were designed and apparently operated much like the DUI checkpoint in *Sitz*. But the purpose was to identify and arrest persons possessing illegal drugs. The officers inquired of the drivers and had drug-sniffing dogs at the ready. The Court found checkpoint stops aimed at such general criminal activity to be unacceptable under the Fourth Amendment because they relied on no particularized suspicion and failed to serve an immediate public interest, such as arresting drunk drivers on the road or interdicting undocumented aliens shortly after they crossed the border. 531 U.S. at 43. In short, the Court found that a checkpoint program "whose primary purpose is ultimately indistinguishable from the general interest in crime control" failed to satisfy Fourth Amendment requirements for a permissible seizure. 531 U.S. at 44.

Particularly significant here, the *Edmond* Court recognized that the primary "programmatic purpose" for the checkpoint controls that determination. 531 U.S. at 46. In turn, the Court rejected the city's argument that a secondary purpose of identifying and arresting impaired drivers would resuscitate an otherwise constitutionally defective checkpoint operation. As the Court stated: "If this were the case, however, law enforcement authorities would be able to establish checkpoints for virtually any purpose so long as they also included a license or sobriety check." 531 U.S. at 46.

In its last substantive case on the issue, the United States Supreme Court held that a police checkpoint might be constitutionally permissible as a means of finding witnesses to a recent crime. *Illinois v. Lidster*, 540 U.S. 419, 426-27, 124 S. Ct. 885, 157 L. Ed. 2d 843 (2004). In that case, the police set up a checkpoint near the location of a fatal hit-and-run accident a week earlier in hopes of contacting witnesses. Each vehicle was delayed on the road for a

matter of seconds as officers asked about any information the occupants might have concerning the hit-and-run. Lister was arrested for DUI because he displayed signs of intoxication; he sought to suppress that evidence as the product of an illegal seizure. The United States Supreme Court analogized a checkpoint stop to elicit information about a specific crime to a voluntary encounter between a law enforcement officer and a pedestrian. In both instances, the citizen may decline to provide information and may not be detained any longer than necessary to establish as much. 540 U.S. at 424-25. But the Court recognized that stopping vehicles would be more intrusive and amounts to a Fourth Amendment seizure, whereas a police officer speaking to a pedestrian in a purely voluntary encounter does not. Although declining to find that sort of checkpoint presumptively unconstitutional, the Court held that the *Brown* balancing should be applied to the particular circumstances. 540 U.S at 426-27.

Those cases collectively establish that motor vehicle checkpoints may be used in conformity with the Fourth Amendment as a means to detect and arrest drunk drivers, to inquire about leads in a particular crime when there is some reason to believe motorists in the vicinity might have relevant information, and, at least near the national borders, to interdict undocumented aliens. Those checkpoints must be operated in a way that substantially curtails or eliminates the ability of law enforcement officers to selectively detain drivers, minimizes the delay, and guards against causing undue anxiety or unease on the part of those stopped. The common element to those checkpoints is a carefully circumscribed investigatory function. In the DUI and immigration stops, that investigation is aimed at a particular systemic problem—either drunk drivers or (again, near border crossings) the influx of undocumented aliens— and identifying persons engaged in those illegal activities. The other permissible investigatory function seeks to identify witnesses to a specific crime based on articulable reasons to believe motorists traveling through the checkpoint might have such information. A properly configured checkpoint to determine if drivers have valid licenses also probably comports with the Fourth Amendment. See *Edmond*, 531 U.S. at 47 n.2.

In addition, the *Edmond* decision establishes a counterpoint to what is constitutionally permissible even within the sphere of investigatory activity. It recognizes that a motor vehicle checkpoint intended as a means of generally investigating criminal wrongdoing cannot withstand review under the Fourth Amendment. See 531 U.S. at 43-44. And that is true even if the checkpoint has a secondary permissible purpose of detecting drunk drivers.

The majority here upholds the checkpoint that snared Rhodes because it satisfies the *Deskins* standards for an acceptable DUI detection operation. But that analysis and the checkpoint's conformity with *Deskins* bypasses the more fundamental constitutional issue. The propriety of the purpose for the checkpoint presents a threshold determination in the Fourth Amendment inquiry. *Edmond*, 531 U.S. at 46; *William*, 603 F.3d at 68. The Overland Park checkpoint was not set up with the principal goal or "programmatic purpose" of interdicting drunk drivers. It was established primarily to fulfill an educational function. That is, the main objective entailed communication of a set of ideas the City of Overland Park concluded would benefit those drivers and their passengers seized and detained in the checkpoint process. There is no exception to the Fourth Amendment that allows government agents to effect seizures of individuals for that reason. A government entity may not exercise its police powers—specifically its authority to detain citizens otherwise going about their business—as a means of publicizing a viewpoint on a given issue. Such a constitutional limitation would seem to follow ineluctably from *Edmond*: If law enforcement officers cannot use a motor vehicle checkpoint to investigate crime generally, they cannot step out of the investigatory sphere altogether to use a checkpoint for some entirely different purpose.

## FREE SPEECH IMPLICATIONS

The constitutional impropriety of the Overland Park checkpoint is only redoubled because the purpose impaired free speech rights protected in the First Amendment. The checkpoint created a captive audience, using the government's power to seize and detain, to facilitate publication of the City's desired message. That cannot be squared with established free speech principles. The checkpoint

implicates the rights of the detained motorists to be free from communication forced upon them as members of a captive audience. It also engaged the City as both a speaker and a regulator of speech.

First and foremost, of course, the Free Speech Clause aims to curtail government interference with or domination of the exchange of information and viewpoints within the body politic. In other words, governmental institutions may neither commandeer the marketplace of ideas nor use their special authority and power to promote or retard trade in particular products in that arena. *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 208, 128 S. Ct. 791, 169 L. Ed. 2d 665 (2008) ("The First Amendment creates an open marketplace where ideas, most especially political ideas, may compete without government interference."); *Thomas v. Collins*, 323 U.S. 516, 537, 65 S. Ct. 315, 89 L. Ed. 430 (1945) (In striking down a Texas statute requiring union organizers to register with the secretary of state, the Court observed: " 'Free trade in ideas' means free trade in the opportunity to persuade to action."); 323 U.S. at 545 (Jackson, J., concurring) ("The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion."); see *Thornhill v. Alabama*, 310 U.S. 88, 95-96, 60 S. Ct. 736, 84 L. Ed. 1093 (1940). The principle, though broad, forms a cornerstone of free speech jurisprudence and supports other, more specific rules. Most of the rules based on that principle deal with government entities as regulators of speech rather than as disseminators of speech. Even so, they largely frame the outcome here.

In service of that fundamental principle, the United States Supreme Court has long recognized that a governmental entity may not compel speech or require a citizen to engage in communication under threat of punishment. See *Wooley v. Maynard*, 430 U.S. 705, 713, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977). Thus, New Hampshire had to allow motor vehicle owners to obscure the state motto "Live Free or Die" on their license plates because, consistent with the Free Speech Clause, a State cannot "require an individual to participate in the dissemination of an ideological message by displaying it on his private property[.]" 403 U.S. at 713;

see *Wooley*, 430 U.S. at 714 ("The right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'"); *Board of Education v. Barnette*, 319 U.S. 624, 642, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943) (School children may not be compelled to recite the pledge of allegiance under threat of expulsion.). Here, of course, the drivers and their passengers were not compelled to speak, but they were compelled to receive oral and written communication they neither solicited nor necessarily wanted. And law enforcement officers detained them for a measurable period specifically for that purpose. The City, through the checkpoint, created a captive audience for its message.

Although a governmental entity typically cannot curtail information third parties disseminate to members of the public based on content, it may step in to regulate the means of dissemination in certain circumstances. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 72, 75, 103 S. Ct. 2875, 77 L. Ed. 2d 469 (1983) (striking down statute prohibiting mailing of unsolicited advertisements for contraceptives). In *Bolger*, the court stated: "The First Amendment 'does not permit the government to prohibit speech as intrusive unless the "captive" audience cannot avoid objectionable speech.'" 463 U.S. at 72 (quoting *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 542, 100 S. Ct. 2326, 65 L. Ed. 2d 319 [1980]). That's because the purported captive audience—in *Bolger*, those persons receiving the mailings in their homes—may avoid the message " ' "simply by averting their eyes." ' " 463 U.S. at 72; see also *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210-11, 95 S. Ct. 2268, 45 L. Ed. 2d 125 (1975) (In striking down an ordinance prohibiting drive-in movie theaters from showing films containing nudity if the screens could be seen from public places, the Court held that the burden to avoid objectionable communication falls on the citizen to avert his or her eyes rather than on the government to limit that speech.). The government may not inhibit protected speech on so gossamer a ground.

Nonetheless, the government does retain the authority to limit "captive audience" communication when the recipient cannot so easily avert the messenger or the message. *Frisby v. Schultz*, 487

U.S. 474, 484-85, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988) (A city may adopt an ordinance limiting picketing in the immediate vicinity of a private residence consistent with the First Amendment and the resident's privacy right to avoid being an "unwilling listener" to an external message while in his or her own home.); see *Snyder v. Phelps*, 562 U.S. 443, 456, 131 S. Ct. 1207, 1218, 179 L. Ed. 2d 172 (2011) (recognizing those sorts of legitimate government limitations on the means of disseminating speech); *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 772-73, 114 S. Ct. 2516, 129 L. Ed. 2d 593 (1994) (In upholding an injunction prohibiting yelling and use of loudspeakers by antiabortion protestors at a clinic, the Court noted the restriction to be content neutral and stated: " 'If overamplified loudspeakers assault the citizenry, the government may turn them down.' ") (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S. Ct. 2294, 33 L. Ed. 2d 222 [1972]). In *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 307, 94 S. Ct. 2714, 41 L. Ed. 2d 770 (1974), a majority of the United States Supreme Court recognized that a municipal transit system could refuse political advertising for display inside its buses even though it accepted ads for products and services because, in part, the message would be inflicted on a captive audience of riders. Speaking for four members of the Court, Justice Blackmun stated Shaker Heights conformed to the First Amendment in prohibiting political messages on the buses "to minimize . . . the risk of imposing upon a captive audience." 418 U.S. at 304. Justice Douglas concurred, providing the fifth vote for a majority judgment, and observed: "[T]he right of commuters to be free from forced intrusions on their privacy precludes the city from transforming its vehicles of public transportation into forums for the dissemination of ideas upon this captive audience." 418 U.S. at 307 (Douglas, J., concurring in judgment).

By the same token, a state or municipality cannot itself impose communication on a captive audience it creates through the exercise of uniquely governmental authority to seize and detain, thereby depriving the audience members of the ability to avoid the message simply by looking or walking away. Here, the drivers funneled into the checkpoint had no choice; they were compelled to

stop and participate in the process. The Fourth Amendment prohibition on unreasonable seizures alone may be sufficient to render the checkpoint unconstitutional. A seizure to facilitate the government's own communication may be unreasonable *per se* absent some extraordinary and immediate risk imperiling public safety. But free speech considerations ought to cement that conclusion even if they might fail as a wholly independent basis to prohibit motor vehicle checkpoints as a medium for government communication.

Here, of course, the City itself engaged in communication by having its police officers hand out flyers—the venerable practice of leafleting. See *Lovell v. Griffin*, 303 U.S. 444, 452, 58 S. Ct. 666, 82 L. Ed. 949 (1938). The circumstances, however, made the offer of the leaflet (and whatever remarks came with it) one the motorists could not refuse. Judicial treatment of government entities as speakers rests on comparatively new and somewhat undeveloped legal theory. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 481, 129 S. Ct. 1125, 1139, 172 L. Ed. 2d 853 (2009) (Stevens, J., concurring) (describing the government speech doctrine as "recently minted" and of "doubtful merit"); see 129 S. Ct. at 1141 (Souter, J., concurring in judgment). Overland Park's use of checkpoints for communication appears to outstrip those theories. The government speech doctrine recognizes that a governmental entity may engage in communication promoting a particular viewpoint without violating the First Amendment. *Pleasant Grove City*, 129 S. Ct. at 1131 ("A government entity has the right to 'speak for itself.' ") (quoting *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229, 120 S. Ct. 1346, 146 L. Ed. 2d 193 [2000]). That is, when the government speaks, it need not take into account competing positions on an issue and publicize those views along with its own. 129 S. Ct. at 1131. Nor are government entities confined to communicating banal or popular views. And they may use their power to tax to fund that communication even though some taxpayers almost certainly hold deep-seated contrary opinions. *Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 562, 125 S. Ct. 2055, 161 L. Ed. 2d 896 (2005).

The contours of a government's rights as speaker remain ill-defined. The doctrine, however, does acknowledge limits on what a government may communicate and how it may communicate. *Pleasant Valley Grove*, 129 S. Ct. at 1131 ("This does not mean that there are no restraints on government speech."); 129 S. Ct. at 1140 (Breyer, J., concurring) (Government speech should be treated "as a rule of thumb," recognizing that a governmental entity could communicate in a way that "might well violate the First Amendment."); *Sutliffe v. Epping School Dist.*, 584 F.3d 314, 331 & n.9 (1st Cir. 2009). And the doctrine appears to deal with the content of government speech—not the means of communication. See *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995) ("[W]hen the State is the speaker, it may make content-based choices."); *Downs v. Los Angeles Unified School Dist.*, 228 F.3d 1003, 1013 (9th Cir. 2000), *cert. denied* 532 U.S. 994 (2001) ("[W]hen a public high school is the speaker, its control of its own speech . . . is measured by practical considerations applicable to any individual's choice of how to convey oneself: among other things, content, timing, and purpose."). Accordingly, a governmental entity has some obligation to self-regulate the means it uses to communicate and may not deploy especially intrusive powers, such as the seizure of citizens, to facilitate its communications. Otherwise, governments would command undue methods of competing in the marketplace of ideas having no counterpart among the methods available to private participants.

A State, therefore, may promote an appreciation of history—New Hampshire's declared goal in *Wooley* for including its motto on license plates—or other messages through a variety of acceptable (and commonly available) channels. The City of Overland Park may educate about the perils of drinking and driving in all kinds of ways, such as public service announcements in local media, billboards, or information posted on its website.

But when a government entity speaks, it cannot unsheath a weapon as potent and unmatched as the power to seize even if the message ostensibly promotes the commonweal. That must be so in large measure because the First Amendment does not pick and

choose among ideas, giving safe harbor to those commonly considered well-intentioned and falling away from those viewed as offensive or ill-conceived. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 504, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984) ("Under our Constitution 'there is no such thing as a false idea.' ") (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339, 94 S. Ct. 2997, 41 L. Ed. 2d 789 [1974]). The First Amendment applies equally regardless of the message conveyed. A speaker gets no greater protection against government interference with his or her message because it hews to the orthodoxy of the day. A necessary correlate for government speech must recognize that a governmental entity cannot use its unique power and authority as a means to communicate its chosen views even if those views presumably promote some public good.

A prohibition on motor vehicle checkpoints for educational purposes does not inhibit a government's message (or viewpoint), only the medium. It, therefore, would function as a valid and, indeed, necessary time, place, and manner restriction on government speech. See *Snyder*, 131 S. Ct. 1218 (A government may impose reasonable time, place, or manner restrictions on otherwise protected speech of third parties.); *Frisby*, 487 U.S. at 487-88 (A government may ban targeted residential picketing precisely because the " 'evil' " lies in " 'in the medium of expression itself.' "). A governmental entity, as regulator, may impose reasonable restrictions on the time, place, or manner of a private party's protected speech so long as those limitations are content neutral, tailored to serve a significant public interest, and permit sufficient alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989).

There is scant reason to suppose a governmental entity cannot be required to regulate its own speech through such viewpoint-neutral limitations, especially where the contemplated medium imperils the listener's fundamental rights. The government speech doctrine should not be otherwise. Established principles of First and Fourth Amendment law certainly are not. When a governmental entity fails to self-regulate in that way, the courts may step into the breach to preserve the full measure of constitutional rights

that otherwise would melt away. There is nothing untoward in courts finding executive decisions or legislative enactments to be violative of the Constitution and providing appropriate remedies for any violation. See *United States v. Raines*, 362 U.S. 17, 20-21, 80 S. Ct. 519, 4 L. Ed. 2d 524 (1960); *Berentz v. Comm'rs of Coffeyville*, 159 Kan. 58, 62-63, 152 P.2d 53 (1944). That, of course, is the enduring jurisprudential nugget of *Marbury v. Madison*, 5 U.S. (1 Cranch) 49, 69-71 (1803).

An educational motor vehicle checkpoint, then, cannot be constitutionally permissible. If it were, the City could set up checkpoints to hand out literature promoting an increase in the mill levy or sales taxes to put more police officers on the street. A majority of some future city council might be tempted to do the same to publicize a point of view on any number of issues, controversial or otherwise. And, presumably, Overland Park police officers could stop pedestrians on the street and detain them long enough to listen to a sermonette on drunk driving. Or those officers could round up people walking by city hall and march them to the building's foyer to watch a 60-second video. Those sorts of intrusions cannot be reconciled with constitutional protections designed to afford citizens a buffer against overly meddlesome government, particularly in the sensitive areas of free speech and religious practice under the First Amendment and of physical integrity of one's person under the Fourth Amendment.

## CONSIDERING LOOSE ENDS OF A SORT

Two considerations remain unaddressed in this analysis and, thus, could be described as loose ends. The first is whether the good-faith exception to the exclusionary rule might salvage the seizure of Rhodes and the evidence then obtained from her. I endeavor to tie up that loose end. The second deals with the propriety of combining DUI checkpoints with ancillary educational functions. I comment on that but leave the end dangling, since it really does not affect this case.

The exclusionary rule requires that the State be precluded from presenting evidence obtained in violation of the Fourth Amendment to convict a criminal defendant. The purpose is not to protect

the defendant so much as to preserve the integrity of those constitutional rights by deterring police conduct that degrades them. *Herring v. United States*, 555 U.S. 135, 140-43, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009); *United States v. Leon*, 468 U.S. 897, 906, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). That is, if law enforcement officers cannot benefit from violating search and seizure rights because any evidence obtained will be useless in a prosecution, they will avoid committing such violations. *Elkins v. United States*, 364 U.S. 206, 217, 80 S. Ct. 1437, 4 L. Ed. 2d 1669 (1960) (The exclusionary rule's "purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."). In turn, innocent citizens will be spared the consequences of that impermissible law enforcement conduct in the future. See *Leon*, 468 U.S. at 919-20.

But the courts have engrafted a good-faith exception onto the exclusionary rule. The exception comes into play if the deterrent effect of suppressing the challenged evidence is scant as compared to the cost of denying prosecutors the use of that evidence in the particular case. *Herring*, 129 S. Ct. at 700-01 (The exclusionary rule need not be applied when it would provide "marginal deterrence" as measured against the societal cost of that application, typically in "letting guilty and potentially dangerous defendants go free[.]"); *Leon*, 468 U.S. at 907-08. (*Herring* and *Leon* stand as the United States Supreme Court's bookend decisions on the good-faith exception to the exclusionary rule. The Court recognized the exception in *Leon*, and *Herring* presents the most recent exegesis on the subject.) The good-faith exception paradigmatically comes into play when a law enforcement officer conducts a search based on a warrant signed by a judge that is later determined to be legally insufficient. Suppressing any evidence seized in that situation would not change the law enforcement officer's future conduct, since the officer did what was proper in getting a judge to review and approve the warrant. The error was the judge's, and the exclusionary rule is highly unlikely to affect judicial conduct. See *Leon*, 468 U.S. at 900, 916-17, 926.

Conversely, however, the exclusionary rule can and should be applied when the police conduct is "sufficiently deliberate that ex-

clusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 129 S. Ct. at 702. The rule then "serves to deter" police conduct that is either intentional or results from "recurring or systemic negligence" and compromises the rights protected by the Fourth Amendment. 129 S. Ct. at 702. The *Leon* Court made much the same point in explaining when the good faith exception should *not* be invoked: "If exclusion of evidence . . . is to have any deterrent effect, therefore, it must alter the behavior of the individual law enforcement officers or the policies of their departments." *Leon*, 468 U.S. at 918.

This case presents a near perfect example of when the exclusionary rule should be applied. Rhodes is a misdemeanant—she was prosecuted in municipal court—charged with an offense that entails no criminal intent. (That is not to suggest drunk driving should be minimized. The collective cost of drunk driving on a national scale is profound. But the exclusionary rule weighs the impact of lost evidence on a particular prosecution without regard to the global impact of the type of crime.) The Fourth Amendment violation here resulted from a programmatic or systemic decision of the Overland Park Police Department to run a motor vehicle checkpoint principally for an educational purpose. The purpose cannot be justified under existing Fourth Amendment precedent. But the police department likely would continue such checkpoints until given a tangible reason to discontinue them. The exclusionary rule does so. The police department ought to be deterred if evidence obtained through the checkpoint may not be used to prosecute drunk drivers interdicted as part of the secondary purpose of the operation.

On the other side of the balance, the checkpoint had a deleterious effect on Rhodes' Fourth Amendment protection against unreasonable seizure. But unlike the typical criminal case, the Fourth Amendment degradation didn't end with the defendant. The rights of all the other drivers and their passengers were violated. Each of them may well have had a civil action under 42 U.S.C. § 1983 (2006) for declaratory and injunctive relief, at least nominal damages, and attorney fees. (Because the checkpoint was conducted in

2008, the statute of limitations on any civil suit has run. See *Owens v. Okure*, 488 U.S. 235, 249-50, 109 S. Ct. 573, 102 L. Ed. 2d 594 (1989) (limitations period for § 1983 action incorporates state statute governing general personal injuries); K.S.A. 60-513.) The collective violation of more than 600 persons' Fourth Amendment rights weighs heavily in favor of applying the exclusionary rule.

My analysis raises the question of when (or if) an educational purpose might be incorporated into a motor vehicle checkpoint as a subsidiary objective. The issue is not directly in play here, since the primary purpose was an educational one and that, in my view, must be constitutionally infirm. In other words, a government entity cannot operate a checkpoint with the sole or even primary aim of disseminating a message to those seized absent an immediate crisis, such as an impending natural disaster, demanding use of all available channels of communication to avoid imminent loss of life.

If a governmental entity operates a checkpoint with the stated primary purpose of detecting and arresting drunk drivers, may it then fold in a secondary educational function? The question opens up both legal and factual issues. A defendant likely could challenge the government's claim as to which was the true primary purpose and which was secondary, thus presenting a fact determination for the court hearing a motion to suppress. Even if the primary purpose were catching drunk drivers, an entirely unrelated secondary educational goal—touting the benefits of attracting casino gambling as a way of generating municipal revenue—might sufficiently taint the operation so as to make any evidence obtained constitutionally infirm. I leave that issue for another day. Likewise, I pass on the issue of whether the Overland Park checkpoint in this case would have been constitutionally acceptable if the primary purpose were DUI detection and arrest and the secondary purpose were distribution of educational material on the dangers of drinking and driving, an obviously related topic. See *State v. Reynolds*, 319 N.J. Super. 426, 432-33, 725 A.2d 1129 (1998) (In a pre-*Edmond* case, the court finds distribution of literature on drunk driving at a DUI checkpoint would not violate the Fourth Amendment.).

## Conclusion

States and municipalities may operate motor vehicle checkpoints to identify and arrest drunk drivers without offending the Constitution. But governments cannot use those checkpoints as a means of communicating information or ideas they consider beneficial or worthwhile. I would reverse the decision of the district court and remand with directions that the motion to suppress be granted.